Robert HICKS and Leon E. Rayford

v.

Robert C. WEAVER, in his capacity as Secretary of the United States Department of Housing and Urban Development.

Robert HICKS and Leon E. Rayford

v.

Charles M. HUGHES, in his capacity as Chairman of the Board of Commissioners of the Housing Authority of the City of Bogalusa, and the Housing Authority of the City of Bogalusa.

Civ. A. Nos. 68–986, 68–987.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 2, 1969.

Supplemental Order Sept. 10, 1969.

620

Richard B. Sobol, Rita Murphy, Robert P. Roberts, New Orleans, La., for plaintiffs.

Hugh Fleischer, Dept. of Justice, Washington, D. C., for Robert C. Weaver.

John Gallaspy, Bogalusa, La., for Charles M. Hughes and The Housing Authority of City of Bogalusa.

Ernest R. Duff, Columbia, Miss., for Marvin L. Polk, d/b/a Polk Const. Co.

HEEBE, District Judge:

These suits were brought by Robert Hicks and Leon E. Rayford, Negro residents of Bogalusa, Louisiana, in their own behalf and on behalf of all other Negro residents of Bogalusa, seeking to prevent the construction of federally assisted low-rent public housing at various sites in the City of Bogalusa on the ground that the sites selected for the construction would perpetuate segregation in public housing, thus resulting in discrimination against the plaintiffs and all other members of the class they represent. One suit, invoking the jurisdiction of this Court under 28 U.S.C. §§ 1331, 1343(3), was filed against Charles Hughes in his capacity as Chairman of the Board of Commissioners of the Bogalusa Housing Authority (BHA) and the BHA. It seeks a declaratory judgment that the location of the housing project in racially segregated neighborhoods, where other locations for the construction of such housing are available, violates § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as well as the due process and equal protection clauses of the Fourteenth Amendment, and prays for injunctive relief. The other suit, with jurisdiction based on 28 U.S.C. §§ 1331, 1343(4), 1346, 1361, was brought against Robert Weaver[1] as Secretary of the United States Department of Housing and Urban Development (HUD). It seeks a declaratory judgment that federal assistance to public housing units located in racially segregated neighborhoods or planned without the significant participation by minority group representatives violates § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and the due process clause of the Fifth Amendment, and prays for injunctive relief.

(1) *Class Action.* One of the plaintiffs, Robert Hicks, owns his own home and earns too much money to be eligible for low-rent public housing in Bogalusa. He is thus not within the class of persons subject to discrimination in public housing in Bogalusa and lacks standing to maintain this suit. See Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). However, the other plaintiff, Leon Rayford, is eligible for low-rent public housing in Bogalusa. His representation of the class satisfies the requirements of F.R.Civ.P. 23(a) and (b) (2). The BHA points out, however, that Rayford and his family were offered a vacancy in a low-rent housing unit located in an all-white area and that he refused it.[2] The BHA argues that

---

1. George M. Romney, present Secretary of HUD, has been substituted as party defendant in place of Robert C. Weaver, pursuant to F.R.C.P. 25(d) (1).

2. The vacancy offered to Rayford was in an all-white housing project located in an all-white neighborhood. Rayford and his family would have been the only

because of Rayford's refusal to occupy the vacancy offered to him, he is not a proper member of the class and cannot maintain this action. We disagree.

The discrimination which this suit seeks to alleviate does not involve the assignment of tenants. If it did, then the BHA's argument would carry strong weight, because Rayford would hardly be in a position to claim that he was refused occupancy in a project occupied by whites solely because of his race. Rather, this suit seeks to alleviate discrimination in the location of the sites for the housing project. As a prospective tenant, Rayford has the same interest in this issue as any other Negro eligible for low-rent public housing in Bogalusa. Nor does it matter, as far as this claim is concerned, that Rayford could have obtained occupancy in a white project, for even those already occupying public housing projects have the right to freedom from discrimination in the location of sites. As stated by Gautreaux v. Chicago Housing Authority, 265 F. Supp. 582 (N.D.Ill.1967); 296 F.Supp. 907 (N.D.Ill.1969):

> "[P]laintiffs, as present and future users of the system, have the right * * * to have sites selected for public housing projects without regard to the racial composition of either the surrounding neighborhood or of the projects themselves." (emphasis added) 265 F.Supp. 582 at 583.

We cannot deny the status of Rayford to maintain this suit, in which he has a clear interest, as a class action merely because he would be an improper person to maintain a suit on some different claim. The class, of course, includes all Negroes in Bogalusa who reside in federally-assisted low-rent public housing or who are eligible therefor.

(2) *Merits.* The vast majority of Negroes in Bogalusa live in two neighborhoods—the so-called Poplas Quarter in northeast Bogalusa, which is totally Negro, and a portion of southeast Boga-

lusa, which is overwhelmingly Negro. The portion of Bogalusa west of Columbia Road is predominantly white. Six public housing projects are presently in existence in Bogalusa. Two of these projects, containing a total of 140 units, are located in the predominantly white area of Bogalusa west of Columbia Road and are occupied *solely* by white persons. The other four projects, with a total of 200 units, are located in the Negro areas of Bogalusa—two of the projects are located in the Poplas Quarter and two are located in the Negro section of southeast Bogalusa. These four projects are occupied *solely* by Negroes. In 1963 the BHA made a determination to construct 100 additional low-cost housing units. The BHA's decision to construct additional low-cost housing units was motivated, in part, by a prior decision of a large manufacturing corporation in Bogalusa to destroy the large number of dwellings the corporation had formerly rented to Negroes. The additional 100 housing units were planned for Negro occupancy, and the BHA considered sites only in Negro neighborhoods. The sites for the proposed project were selected between June and September 1963. Since the original selection of the sites, two of the proposed 100 units were abandoned, but the sites on which the BHA now proposes to construct the 98 units are the same sites that were selected in 1963 and approved by HUD shortly thereafter. There have been no additions and no changes in the sites. All of the proposed 98 units would be built in the Negro sections of Bogalusa. Fifty-two units would be built in the Poplas Quarter and 46 would be built in the Negro section of southeast Bogalusa.

The BHA was established in 1948 or 1949. It is composed of five members, all of whom are appointed by the Mayor of Bogalusa. No Negro has ever been a member of the BHA in its twenty-year history. All of the employees of the BHA, other than maintenance men, are

---

Negroes living in that area. The vacancy was refused because of Rayford's fear of possible harm to his family while he was at work.

white. No Negro citizen of Bogalusa was called upon to advise or consult with the BHA on the question whether the Negro community wanted additional public housing to be built for Negroes, or the question whether such housing should be located in all-Negro neighborhoods, or the question of the selection of particular sites, or any other aspect of the program.

On May 16, 1963, the Public Housing Administration ("PHA," a predecessor agency to HUD) approved a "reservation" for the BHA of 100 low-rent dwelling units to be financed under the U. S. Housing Act of 1937. On November 23, 1964, a Mr. Tedman, representing the PHA, visited Bogalusa to inspect the sites that had been selected by the local authorities for the construction of the new units. It was made "absolutely" clear to Mr. Tedman that all of the proposed sites were in all-Negro neighborhoods. Previously, the PHA had been informed by the BHA that the proposed units were planned for Negro occupancy. Beginning with its approval of the original "reservation," and continuing up until the time of the institution of this suit, officials of HUD or predecessor agencies directed every detail of the development and construction of the proposed units, even down to the question of the location of the plumbing fixtures in the kitchens of the proposed units. The approval of federal officials was required at every step.

█ In a series of interpretations, and with increasing clarity and vigor, HUD has indicated that Title VI of the Civil Rights Act of 1964 forbids the construction of federally-financed public housing in all-Negro neighborhoods in the absence of a clear showing that no other acceptable sites are available. Its most recent interpretation provides as follows:

"The aim of a Local Authority in carrying out its responsibility for site selection should be to select from among sites which are acceptable under the other criteria of this Sec-tion those which will afford the greatest opportunity for inclusion of eligible applicants of all groups regardless of race, color, creed, or national origin, *thereby affording members of minority groups an opportunity to locate outside of areas of concentration of their own minority group. Any proposal to locate housing only in areas of racial concentration will be prima facie unacceptable* and will be returned to the Local Authority for further consideration and submission of either (1) alternative or additional sites in other areas so as to provide more balanced distribution of the proposed housing or (2) a clear showing, factually substantiated, that no acceptable sites are available outside the areas of racial concentration." (emphasis added) Low-Rent Housing Manual, § 205.1 ¶ 4(g), (February 1967 Revision).

As HUD is the administrative agency charged with the interpretation and enforcement of Title VI in the housing area, its interpretation is entitled to considerable weight by the courts. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); FTC v. Mandel Bros., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed. 2d 893 (1959).

█ The interpretation placed upon the Civil Rights Act of 1964 by HUD is not unwarranted. The principle that location is highly relevant to non-discrimination in public programs has been recognized by the Fifth Circuit in the analogous area of school construction. United States v. Board of Public Instruction of Polk County, 395 F.2d 66 (5th Cir. 1968); United States v. Jefferson County, 380 F.2d 385 (5th Cir. 1967), cert. den., Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; Board of Public Instruction v. Braxton, 326 F.2d 616 (5th Cir. 1964). See also, Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967). That same principle must be applicable to public housing. It would, in fact, be totally unrealistic to say that the location of public housing is

not relevant to the issue of discrimination. This does not mean that the location of public housing in all-Negro neighborhoods is *per se* a violation of 42 U.S.C. § 2000d. But it does create a strong inference which, if unexplained, may be sufficient to support that conclusion. Such an inference might be rebutted by showing, for example, that no other acceptable sites are available. Ultimately, we must consider all of the circumstances surrounding the location of the sites, and the fact that the sites are located in Negro areas is certainly a prime factor to consider in determining whether discrimination exists. We think Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D.Ill.1967); 296 F. Supp. 907 (N.D.Ill.1969), correctly states the overriding principle:

> "[P]laintiffs * * * have the right * * * to have sites selected for public housing projects without regard to the racial composition of either the surrounding neighborhood or of the projects themselves." 265 F.Supp. 582 at 583.

Until about a year prior to the completion of the hearing in this case, all public housing in Bogalusa was officially segregated; the occupancy of each project was limited to members of one race only. Thus, quite naturally, the projects to be occupied by white persons were located in white neighborhoods and those to be occupied by Negroes were located in Negro neighborhoods. The sites for the project under attack in this suit were selected at a time when all public housing in Bogalusa was officially segregated. The project in question here was intended for Negro occupancy. Consequently, the BHA considered *only* sites located within all-Negro or virtually all-Negro neighborhoods and therefore selected only sites in Negro neighborhoods.

The project was clearly conceived to provide housing for Negroes in Negro neighborhoods. It was implemented with this intent and its present posture conforms to its original design. The BHA considered the racial concentration of the neighborhoods before it looked to any other factor governing the selection of sites. Its purpose in doing so was to maintain segregation in public housing in Bogalusa.

Moreover, if not enjoined, the BHA will succeed in accomplishing its purpose. For almost a year prior to the completion of the hearing in this case, the BHA has had an "open-door" policy with respect to public housing; that is, it abandoned its policy of segregation in public housing and opened the doors of all public housing projects in Bogalusa to members of either race. But despite this fact, not one white person has moved into a public housing project located in a Negro neighborhood in Bogalusa. The only logical inference we can draw from this fact, particularly in light of the history of segregation in public housing in Bogalusa, is that white persons most likely will not move into public housing projects located in Negro neighborhoods in Bogalusa. The defendants introduced no evidence whatsoever to defeat or even to combat this inference.

This, then, is a case where the dominant factor in selecting sites for the location of public housing was the racial concentration of the neighborhoods. Its purpose was to perpetuate segregation of the races in public housing, and the present location of the sites will most likely perpetuate segregation. This is rank discrimination forbidden by both the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 2000d. Cf., Gautreaux v. Chicago Housing Authority, *supra.* Likewise, through its Secretary Weaver, HUD has violated the plaintiffs' rights under 42 U.S.C. § 2000d. As noted above, HUD was not only aware of the situation in Bogalusa but it effectively directed and controlled each and every step in the program. Nothing could be done without its approval. HUD thus sanctioned the violation of plaintiffs' rights and was an active participant since it could have halted the discrimination at any step in the program. Consequently, its own discriminatory conduct in this respect is violative of 42 U.S.C. § 2000d.

624

The BHA relies upon Thompson v. Housing Authority of City of Miami, Florida, 251 F.Supp. 121 (S.D.Fla.1966). The facts of that case make it readily distinguishable from the case at bar. In that case the Housing Authority abandoned its policy of segregation in public housing prior to the effective date of the Civil Rights Act of 1964; the area selected for the location of the housing units was inhabited by whites and Negroes; the sites were selected with the full concurrence of the spokesmen of the Negro community; and the housing units were not segregated in fact. In this case the BHA only recently abandoned its official policy of segregation; the sites selected for the project are located in all-Negro or virtually all-Negro neighborhoods; no spokesmen of the Negro community were consulted with reference to the location of the sites or any other aspect of the housing project; and all of the housing units in Bogalusa are, in fact, segregated. These differences make *Thompson* factually inapposite. The selection of the sites in *Thompson* was not racially motivated as it was in the case at bar.

■ (3) *Laches.* On March 29, 1965, the PHA tentatively approved the sites proposed by the BHA for the location of the housing project. This was not a final approval of the sites but only authorization for the BHA to proceed with additional steps required by the PHA prior to its final approval of the sites. Among other things the BHA was required to secure contracts for the survey and appraisal of the tentative sites, which contracts, of course, were subject to approval by the PHA. The BHA was also required to obtain a contract with someone to act as "option negotiator" to secure options to purchase the tentative sites. The proposed contract with the "option negotiator" was approved by the PHA on July 7, 1965. It was apparently not until after this date that any of the owners of the property

tentatively selected for the location of the housing project were contacted by a representative of the BHA with regard to the purchase of their property. Since the location of the tentative sites had not been made public, the contact by the "option negotiator" would be the first opportunity the members of the Negro community had to learn where any of the sites were to be located.[3] It is uncertain whether all of the property owners were apprised of the purpose for which their property was sought; but even if they were so informed, this certainly could not have resulted, however informally, in a full and complete awareness of the planned locations of the housing project by any members of the class involved. Nevertheless, it is clear that contacts made by the "option negotiator" caused "talk" among the members of the Negro community and led them to suspect that the sites were to be located in Negro neighborhoods.

Consequently, a group of Negro spokesmen met with Mr. Hughes and the members of the BHA in the latter part of 1965 and asked that the specific sites for the proposed location of the housing project be identified. This request was refused on the ground that if the information became public knowledge the price of the property sought would increase. Following this meeting Hicks, a leading spokesman of the Negro community, lodged a formal complaint with the PHA against the BHA under Title VI of the Civil Rights Act of 1964 in November 1965. The complaint, as amplified in two subsequent letters from counsel for Hicks, charged, among other things, that the proposed locations for the housing project violated Title VI of the Civil Rights Act of 1964 in that the units were to be located in Negro neighborhoods and would thus have the effect of maintaining racial segregation. This charge, of course, was based only on the suspicions, rather than concrete knowledge, of Hicks and other leaders of the Negro com-

3. It seems that most, if not all, of the persons owning property on which the sites were to be located were Negro.

munity that the sites were to be located in Negro neighborhoods. The exact location of the proposed sites for the housing project was not made known to the Negro leaders of the community until March 11, 1968. Hicks was informed by a letter dated June 8, 1966, from Marie C. McGuire, Commissioner of the PHA, that the complaint filed with the PHA was rejected because the proposed sites were located in racially mixed neighborhoods. The rejection was in no way based upon the fact that Hicks lacked standing to complain about the location of the sites. Shortly thereafter counsel for Hicks requested the PHA, by letter dated July 7, 1966, to reconsider the decision embodied in Mrs. McGuire's letter of June 8, 1966, setting out specifically the inaccuracies in Mrs. McGuire's factual assertions, and particularly noting that the proposed sites were not located in racially mixed neighborhoods as stated in Mrs. McGuire's letter. By letters dated July 25, 1966, and August 19, 1966, officials of HUD, in the latter instance Mrs. McGuire herself, informed counsel for Hicks that the request for reconsideration was being considered and that the Department would communicate further with Hicks' counsel in regard to that request. Although Hicks is not a member of the class involved, the members of the class through activity in Negro organizations were well aware of the complaint filed with the PHA as well as the request for reconsideration of the initial rejection and the responses thereto.

Subsequent to the above communications between Hicks' counsel and HUD officials, various articles of a general nature appeared in the Bogalusa newspaper at various times regarding the problems and the progress of the housing project. However, assured by HUD that the complaint was still under consideration and that the decision would be communicated to them, neither Hicks nor any members of the class took any further steps with regard to the complaint. They felt the complaint was holding up final HUD approval and they were awaiting HUD's decision. They were fortified in this view by repeated public declarations of federal officials condemning discrimination.

On March 7, 1968, Hicks and the members of the class were informed, through an article in the Bogalusa newspaper on that date, that the BHA had approved the bid of the Polk Construction Company for the construction of the project. It was not until an article appearing in the newspaper on April 23, 1968, that they learned that final HUD approval had been obtained. Yet neither Hicks nor his counsel nor any member of the class had ever received any subsequent notification from any government official concerning the request for reconsideration, even though further notification in this regard was twice promised by HUD officials. These suits were filed on May 15, 1968. At the time suits were filed, the actual construction of the housing facilities had not yet begun. A few of the sites had been cleared of brush, leveled and staked out, and mobile or easily fabricated construction offices had been erected on a few of the sites. But no actual excavation or other construction work had begun at that time. No change in this situation has occurred since that time.

Under these facts the defense of laches, urged only by the BHA, falls. Laches is a combination of inexcusable delay plus prejudice. *E. g.,* Penn Mutual Life Ins. Co. v. Austin, 168 U.S. 685, 18 S.Ct. 223, 42 L.Ed. 626 (1898); Powell v. Zuckert, 125 U.S.App.D.C. 55, 366 F.2d 634 (1966); Alexander v. Phillips Petroleum Co., 130 F.2d 593 (10th Cir. 1942); Holman v. Gulf Refining Co. of Louisiana, 76 F.2d 94 (5th Cir. 1935), *cert. den.* 296 U.S. 590, 56 S.Ct. 102, 80 L.Ed. 417. Both of these elements must exist if the defense is to be applicable. Neither element is present in this case.

The touchstone of the first element is diligence. There can be no question but that the claim in this lawsuit was diligently asserted in the first instance.

Representatives of the Negro community were unable to obtain any information from the proper authorities about the location of the specific sites for the housing project. They were unable to gather any information at all about the location of the sites until after HUD approved the proposed BHA contract with the "option negotiator" on July 7, 1965, and he began to contact the property owners. Based on the incomplete information they were thus able to assemble through the "grapevine," they surmised that the sites were to be located in Negro neighborhoods. The complaint was lodged with the PHA in November 1965. This demonstrates extreme diligence in protecting the claim at the outset. The claim, having been filed with the appropriate government agency, was preserved. Bostick v. General Motors Corp., 161 F.Supp. 212 (E.D.Mich.1958). Even though Hicks was the individual who actually filed the complaint, it was obviously filed on behalf of the members of the class, and inasmuch as it was not rejected due to Hicks' lack of standing, it inured to the benefit of the members of the class and preserved the claim for them since the defendants were thus put on notice. See Overfield v. Pennroad Corp., 39 F. Supp. 482 (E.D.Pa.1941). It was not until June 1966, seven months after the complaint was filed, that the PHA announced its decision on the complaint. Shortly thereafter, in July 1966, the complaint was renewed through the request for a reconsideration. This again acted as a preservation of the claim; but, of course, it could not preserve the claim forever. Landell v. Northern Pac. Ry. Co., 122 F.Supp. 253 (D.D.C.1954), aff'd, 96 U.S.App.D.C. 24, 223 F.2d 316 (1955), cert. den., 350 U.S. 844, 76 S.Ct. 85, 100 L.Ed. 752. The question is whether, under the circumstances of this case, the members of the class were required to take further affirmative steps with regard to the complaint. We think not.

Citizens have come to expect delay when dealing with the government. Delay is a hallmark of bureaucratic institutions. Indeed, seven months had elapsed between the time the original complaint had been filed and the time the PHA announced its decision thereon. Thus, the members of the class were well aware that the agency did not act with great dispatch. Moreover, the complainants were assured twice by HUD officials that the request for reconsideration was under consideration and they would definitely hear from HUD on the matter in the future. We think the members of the class were entitled to rely on this assurance given twice, for the period of time involved. This is particularly true where, as here, complainants were well justified in believing that their interests in the matter coincided with the government's avowed policy of abolishing racial segregation in public housing. More importantly, no evidence was introduced to show that anything else occurred during that period which should have put the complainants on notice that the complaint was no longer under consideration. Although the members of the class were aware during this time that the BHA was continuing its efforts with regard to the project, the evidence reflects that they had no inkling that the complaint would be rejected and that final HUD approval would be obtained until the newspaper articles, mentioned above, appeared in the spring of 1968. Shortly after those newspaper articles appeared and put the complainants on notice that the project would receive final approval, these suits were filed. Under these circumstances there was no lack of diligence and no inexcusable delay in bringing these suits.

Likewise, the BHA has failed to show any appreciable amount of prejudice resulting from the delay.[4] The record is

---

4. Laches being an affirmative defense, the defense carries the burden of proof. *E. g.*, Powell v. Zuckert, *supra*.

barren of any evidence to support a finding of prejudice normally contemplated in applying laches such as loss of evidence and unavailability of witnesses; and the facts of this case will not support a presumption of such prejudice. The only prejudice claimed by the BHA is of a financial nature. We are left completely in the dark, however, as to the magnitude of this financial prejudice. Funds were expended on various matters in connection with the project, such as surveys, appraisals, land acquisition, etc. But not all of these expenditures will result in a financial loss to the BHA if the sites are relocated. For instance, the money spent on land acquisition will hardly cause a significant financial loss to the BHA since the City can either sell the property or use the land for other necessary facilities. In short, the BHA has simply not shown what its *actual loss*, if any, will be if the sites must be relocated. Moreover, to a great extent the BHA was proceeding with the project and incurring these expenses at its own risk. Not only were the members of the BHA aware of the pending complaint, but they also acknowledged among themselves the merits of the complaint insofar as it related to the claim asserted herein. Yet the BHA still refused to include additional non-discriminatory sites for the housing project. Thus, even if the BHA was substantially financially prejudiced, which was not established, it can hardly be heard to complain about lost costs incurred after its members acquired knowledge of the complaint, the merits of which they well recognized.

Prejudice, of course, may exist through a change of conditions and the intervention of the rights of third parties. In this case the BHA attempts to rely on alleged financial prejudice to the contractor for the housing project.[5] The contractor entered into eleven subcontracts totaling in excess of $420,000 and expended in excess of $37,000 purchasing supplies and preparing for work under the contract. As noted above, very little work was actually done and actual construction was never begun. Assuming for the sake of this discussion only that the contractor, rather than the BHA, must bear the loss for the expenses incurred by the contractor, we are still unable to find sufficient prejudice to satisfy the second element of laches. The amount of the subcontracts is irrelevant. The relevant query is the liability, if any, incurred by the contractor for work performed on the subcontracts. Assuming for the sake of this discussion only that the contractor would bear the ultimate liability in this connection, we were not presented with any evidence to show the amount of financial prejudice in this respect, if any. In fact, the contractor did not know if any expenses had even been incurred by the subcontractors. Thus, prejudice to the contractor in this respect, assuming that the contractor had to pay, would certainly be *de minimis*. The same must be said about the contractor's expenditures in excess of $37,000. We were not shown what portion of this amount would actually be lost, but since a large portion of that amount went for supplies and equipment, which could be resold or used elsewhere, the actual loss to the contractor, assuming that the contractor rather than the BHA would bear the loss, would not be great. Certainly, such a *de minimis* financial loss is not sufficient prejudice to cast the equities against the claim of the class herein which involves personal rights of such vast importance.

For the foregoing reasons the plaintiffs are entitled to the issuance of a preliminary injunction enjoining the construction of the housing project on the sites presently contemplated by the defendants.

### ORDER

It is the order of the court that defendants Charles M. Hughes, the Housing Authority of the City of

---

5. Although not originally a defendant, the contractor has been added as a party defendant.

Bogalusa, and Marvin L. Polk, doing business as Polk Construction Company, and all persons acting in concert with them or any of them, be, and the same are hereby, preliminarily enjoined from continuing or commencing any work toward the construction of the challenged units pending further orders of this Court or until this matter may be heard and determined on its merits.

It is further ordered that plaintiffs post proper bond in the amount of $5,000, conditioned for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained, pursuant to F.R.C.P. 65 (c).

### Supplemental order

"It is the Order of the Court that defendant, George M. Romney, his agents and employees be, and the same are hereby, preliminarily enjoined from making any further payment of federal funds to the defendant Housing Authority of the City of Bogalusa, except with respect to the existing housing projects pending further orders of this Court, or until this matter may be heard and determined on its merits."