**BLACKSHEAR RESIDENTS ORGANI-
ZATION et al., Plaintiffs,**

v.

**HOUSING AUTHORITY OF the CITY
OF AUSTIN et al., Defendants.**

**Civ. A. No. A-70-CA-51.**

United States District Court,
W. D. Texas,
Austin Division.

Dec. 3, 1971.

As Amended March 17, 1972.

John Scanlan, F. Patrick Hubbard and W. Thomas Buckle, Austin, Tex., for plaintiffs.

Mark Z. Levbarg, Austin, Tex., for Central Texas Chapter, American Civil Liberties Union.

Charles F. Herring, Royce Jay Hailey, Jr., Austin, Tex., for local defendants.

Hugh P. Shovlin, Asst. U. S. Atty., San Antonio, Tex., for George Romney, and others.

**1140**

## MEMORANDUM OPINION

ROBERTS, District Judge.

### 1. *Introduction.*

This suit is brought by the Blackshear Residents Organization (BRO) and six other persons, in their individual capacities and as representatives of all Mexican-American and Negro residents of Austin who are eligible for admission to public housing projects administered by the Housing Authority of the City of Austin, Texas (the Housing Authority), to halt further planning or construction of Project TEX 1–9, a public housing project undertaken by the Housing Authority with funds in large measure supplied by the United States Department of Housing and Urban Development (HUD) pursuant to the Housing Act of 1937. Defendants are the Housing Authority, its Board of Commissioners and Executive Director (local defendants) and the Secretary of Housing and Urban Development and his Regional Administrator (federal defendants).

The gravamen of the complaint is that the Housing Authority, with HUD's blessing, has through its tenant assignment and site selection policies deliberately operated a racially segregated system of public housing in Austin that will be perpetuated and exacerbated if Project TEX 1–9 is built on the site selected by the Housing Authority and approved by HUD. Plaintiffs also claim that HUD has deprived them of due process by failing to articulate its reasons for denying their Civil Rights Complaint, which raised these issues and was submitted to the agency prior to suit, and that the Project TEX 1–9 site is not decent, safe and sanitary as required by the Housing Act of 1937. The trial of this case has revealed no constitutional or statutory infirmity in the Housing Authority's present tenant assignment policy, no denial of due process in HUD's handling of plaintiff's pre-suit Civil Rights Complaint and no sufficient basis for overturning HUD's determination that the site for Project TEX 1–9 is decent, safe and sanitary. However,

there is ample evidence upon which to conclude, without reaching constitutional issues, that the Housing Authority and HUD employed procedures for selecting and approving the Project TEX 1–9 site that did not result in adequate consideration of factors bearing on the racial character of the site, as required by the Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Fair Housing Act of 1968, 42 U.S.C. §§ 3601, 3608(d)(5). This Court so holds, and enjoins local and federal defendants from further proceeding with Project TEX 1–9 at the site in question until the requisite factors have been considered through the implementation of adequate procedures.

### 2. *Procedural Issues.*

█ a. Standing. By Order dated April 20, 1971, the Court held that plaintiffs have standing to bring this action, a ruling from which it does not now depart notwithstanding the reassertion of this defense in defendants' trial briefs. The following cases further support the position taken by this Court: Shannon v. HUD and Urban Development, 436 F.2d 809 (3rd Cir. 1970); Kennedy Park Homes Ass'n v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y.1970); Hicks v. Weaver, 302 F.Supp. 619 (E.D.La.1969); Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D.Ill.1967).

█ b. Class Action. Defendants also contend that this suit is not properly maintainable as a class action because the plaintiffs do not present claims typical of the claims of the class they purport to represent and cannot fairly and adequately protect the interest of the class. The Court finds that all of the requisites of Rule 23(a), Federal Rules of Civil Procedure are satisfied and that a class action is appropriate under Rule 23(b)(2) on behalf of all Mexican-American and Negro residents who presently reside in public housing administered by the Housing Authority or who have filed an application and are otherwise eligible to reside therein.

c. Laches. There is no basis for holding, as local defendants contend, that plaintiffs' complaint is barred by laches. See, Hicks v. Weaver, supra; Gautreaux v. Chicago, supra.

d. Summary Judgment. Still pending at the time of trial were plaintiffs' and local defendants' motions for summary judgment. Because of genuine issues of material fact as to all of the claims for relief asserted, these motions are denied. The Court has reached its findings of fact on the merits herein solely on the basis of the evidence adduced at trial, and has not considered any of the materials offered in support of the motions for summary judgment except those subsequently introduced at trial.

3. *The Merits.*

Of the eight public housing projects presently administered by the Housing Authority, which contain a total of 1,050 units, five are presently occupied almost exclusively by members of one racial or ethnic group, as illustrated by the following table:

Occupancy By Race as of May 28, 1971 [1]

| Project | Race | | |
|---|---|---|---|
| | Anglo | Mexican-American | Negro |
| Booker T. Washington (TEX1–5) | 0 | 3 | 216 |
| Rosewood (TEX1–2) | 0 | 0 | 114 |
| Rosewood Addition for Elderly (TEX1–8) | 0 | 0 | 32 |
| Santa Rita Courts & Addition (TEX1–3 & TEX1–6) | 0 | 71 | 4 |
| Meadowbrook (TEX1–4) | 44 | 46 | 7 |
| Chalmers (TEX1–1) | 62 | 67 | 6 |
| Lakeside for the Elderly (TEX1–7) | 161 | 0 | 0. |

Thus substantial mixing has occurred only in the Meadowbrook and Chalmers Projects, and only between Mexican-Americans and Anglos.

The racial and ethnic character of the neighborhoods in which these projects are located correlates very closely to the occupancy pattern depicted above. Thus the projects occupied solely or substantially by Negroes, Booker T. Washington, Rosewood, and Rosewood Addition for the Elderly, are located in areas characterized by a concentration of Negroes. Similarly, the predominantly Mexican-American projects, Santa Rita Courts and Addition, are located in an area characterized by a concentration of Mexican-Americans. Of the three projects containing substantial Anglo occupancy, all of which were originally built in predominantly Anglo areas of Austin, Chalmers is in an area now solidly Mexican-American in character and Meadowbrook is in an area containing substantial numbers of Mexican-Americans. Lakeside for the Elderly, the only project occupied exclusively by Anglos, is in a predominantly commercial area but borders upon a predominantly Mexican-American neighborhood. Moreover, five of the eight projects, comprising 726 of the 1,050 units operated by the Housing Authority, are located in an area of Austin locally known as "East Austin", which is roughly bounded on the north by Manor Road and East 19th Street, on the south by the Colorado River, on the east by Bluestein Blvd. and on the west by Interstate Highway 35. It is undisputed that the overwhelming majority of Ne-

1. Local Defendants' Stipulation No. 38.

groes and Mexican-Americans in Austin reside in "East Austin", and it is here that Booker T. Washington, Rosewood, Rosewood Addition for the Elderly, Santa Rita Courts and Addition, which are essentially one-race projects, and Chalmers Courts, which is less than 50% Anglo-occupied, are located. Of the 364 units situated outside "East Austin", 164 units are occupied exclusively by Anglos at Lakeside for the Elderly in downtown Austin and the remaining 160 units are occupied by all three ethnic groups at Meadowbrook in south Austin.

These obviously segregated patterns of occupancy and site location in the Austin public housing system were brought about in large measure through the conscious design of the Housing Authority and with the knowing approval of HUD and its predecessor agency, the Public Housing Administration.[2]

Beginning in the late 1930's and early 1940's the Housing Authority began seggregating the three ethnic groups by building the first three projects, Chalmers Courts for Anglos, Rosewood for Negroes and Santa Rita Courts for Mexican-Americans, in accordance with an official Austin city plan adopted in 1928, that had as its purpose to encourage the settlement of Negroes in "East Austin" and pursuant to a City Planning Commission Resolution approving the Housing Authority's request to locate these "three racial housing projects" on sites the Planning Commission found to be fitting to their racial character.[3] This city plan was still in effect during the 1950's when Meadowbrook, Booker T. Washington Terrace and Santa Rita Addition were built.[4] Then in the 1960's the Housing Authori-

ty built two projects for the elderly, Lakeside for Anglos and Rosewood Addition for Negroes, intending at the time to segregate the tenants by race. The evidence shows and this Court finds that from 1938 to 1967, it was the official policy of the Housing Authority to segregate Anglos, Negroes and Mexican-Americans into different public housing projects.[5] On October 27, 1967, the Board of Commissioners of the Housing Authority finally adopted a resolution abandoning the prior system of segregation and adopted a "freedom of choice" plan. During the prior 28 years, however, public housing in Austin was designed, named, located for and occupied by particular racial or ethnic groups. The result has been that the various projects have historically been identified as Anglo, Negro and Mexican-American, and while a substantial number of Mexican-Americans have lately been admitted to formerly all Anglo projects, the basic racial or ethnic identification remains.

From the commencement of the public housing program in Austin, HUD participated in the planning, construction and operation of the system. All project sites proposed by the Housing Authority had to be approved by HUD and this agency approved each project built in Austin with knowledge of the racial classification attached to it.[6] Moreover, HUD was aware of and condoned the Housing Authority's tri-ethnic tenant occupancy system until the late 1960's, despite knowledge that similar action by a local authority had judicially been declared contrary to the 5th Amendment to the Constitution[7] and that the Housing Authority's policy contravened the Housing Act of 1949. Indeed, a former HUD

2. As a matter of convenience, both agencies will hereafter be called "HUD".

3. Plaintiffs' Exhibit No. 64a.

4. Plaintiffs' Exhibit No. 76.

5. Testimony of Harmon J. Hodges; Deposition of Harmon J. Hodges at 41; Government's Exhibits N and P.

6. Government's Exhibits N and P; Testimony of Harold Odom, HUD Regional Director of Title VI Complaint and Compliance; Deposition of Harold Odom at 51–52.

7. Heywood v. Public Housing Administration, 238 F.2d 689 (5th Cir. 1956); Testimony of H. Odom; Deposition of H. Odom at 51–52, 78.

official testified that until the mid-1960's HUD itself followed a "separate but equal" policy despite the affirmative duty imposed by the Housing Act of 1949, 42 U.S.C. § 1441, to encourage and promote "integrated" housing.[8] Thus the Court has no difficulty finding that HUD was a knowing and willing partner with the Housing Authority in pursuing a policy of racial segregation from 1938 through October 1967.

Project TEX1-9 had its inception in February 1966, when the Housing Authority obtained from the Austin City Council a binding "Cooperation Agreement" authorizing it to construct 1000 additional units of public housing. Following its administrative determination to build 750 regular family units and 250 elderly units, the Housing Authority received a preliminary loan from HUD for 300 regular family units in May 1966, and beginning in January 1967, proposed a series of sites to HUD for Project TEX1-9. On January 3, 1969, HUD approved the site now in controversy, subject to annexation and rezoning of the land by the city, and following fulfillment of these conditions finally approved the site in November 1969.

Within the past year, the size of Project TEX1-9 has been reduced from 300 to 266 units, thereby increasing to 484 the number of remaining regular family units authorized under the Cooperation Agreement with the City. After this lawsuit was filed in June 1970, the Housing Authority decided to build 430 of the remaining regular family units under the Turnkey method of construction, and to place all such projects in scattered sites outside the area contended by plaintiffs to be an area of minority concentration. These sites have been selected by the Housing Authority and approved by HUD, and plaintiffs agree that they are acceptable in terms of equal opportunity. Since no sites have been selected for the elderly units, the only specific issue of site selection presented to and determined by the

Court is the site proposed for Project TEX1-9.

It is against the foregoing factual background that the Court proceeds to consider, seriatim, the allegations of plaintiffs' Amended Complaint.

a. HUD's Investigation and Disposition of Plaintiffs' Civil Rights Complaint.

In February 1970, plaintiffs BRO and Aguilar, with others, filed a Civil Rights Complaint with HUD pursuant to 24 C. F.R. § 1.7(b), alleging that the Housing Authority was denying their right to equal housing opportunity, as secured by the Civil Rights Acts and the Constitution, by using a tenant admission policy that perpetuated the segregated public housing system and by locating projects primarily in areas of minority concentration. The site for Project TEX1-9 was specifically challenged on the latter ground. When no reply was forthcoming from the agency, plaintiffs filed this suit on June 11, 1970, initially alleging in their first cause of action that HUD had deprived them of due process by failing to investigate and act on their Civil Rights Complaint. At a preliminary hearing held July 16, 1970, this Court ordered HUD to investigate the complaint and in August and October 1970, teams of HUD personnel visited Austin and conducted investigations. On October 13, 1970, defendant Morgan by letter notified plaintiffs that their complaint lacked merit, whereupon plaintiffs amended their First Cause of Action to allege a denial of due process resulting from HUD's failure to articulate reasons in support of this determination.

Plaintiffs take the position that when administrators make decisions that affect important private interests, elementary due process requires them contemporaneously to give factual reasons for the decision made. Thus, they say, since their "essential" right to equal opportunity in housing is at stake and since civil rights complaints play an important

---

8. Testimony of W. W. Collin, former HUD Regional Administrator.

role in protecting that right, HUD was required to recite the factual findings upon which it relied in making the decision embodied in the letter replying to plaintiffs' Civil Rights Complaint.

■■ This argument fails principally because its major premise is overbroad. Neither the Housing Act of 1937 nor the Civil Rights Acts of 1949 or 1964 require the agency even to receive and act on "civil rights complaints", see Shannon v. HUD, supra, much less make formal fact findings when ruling on such complaints. The complaint procedure is instead wholly a creature of HUD regulations, which do not themselves require formal findings. See 24 C.F.R. § 1.7. Neither of the Administrative Procedure Act requirements providing for formal findings in certain rule-making and adjudicatory proceedings apply here, see 5 U.S.C. §§ 553(a) (2), 554(a), and although formal findings may be required in the absence of statutory directives in cases where the action taken by the agency is ambiguous, see City of Yonkers v. United States, 320 U.S. 685, 64 S.Ct. 327, 88 L. Ed. 400 (1944) and American Trucking Ass'ns v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), no such ambiguity exists here; HUD has clearly denied the relief sought in plaintiffs' complaint. See, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Plaintiffs therefore had no right to formal findings, but only to an investigation of their complaint and a decision by the agency as provided by 24 C.F.R. § 1.7 and 5 U.S.C. § 555(e), which, after some assistance from this Court, they received. The relief requested will accordingly be denied.

(b) Denial of Equal Opportunity—The Housing Authority's Tenant Assignment Procedures.

In their Second Cause of Action, plaintiffs allege that the Housing Authority has utilized an admissions procedure that causes concentration of tenants by race in particular projects and has refused to adopt affirmative procedures that would reduce such racial concentration, all in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, and the Fair Housing Act of 1968. By way of relief, plaintiffs seek an order compelling the Housing Authority to submit to the Court a comprehensive desegregation plan that would eliminate racially-identifiable projects in the system, implementation of which would be supervised by the Court through retention of jurisdiction until integration of the system is achieved.

As is amply shown by the factual background set out earlier, the Housing Authority officially and deliberately pursued a policy of segregating public housing tenants by race from the time the first projects were built until October 27, 1967. Although the "freedom of choice" plan adopted on that date [9] has

---

9. Plaintiffs' Exhibit No. 20. The plan is identical to that prescribed in HUD regulations, Low Rent Housing Administration of Program Handbook, RHA 7401.1, Chapter 9, Section 1, Appendix 2, paragraph 1 of which provides:

"c. . . . Each applicant shall be assigned his appropriate place on a community wide basis in sequence based on date and time his application is received, suitable type of size of unit, and factors affecting preference of priority established by the Local Authority's regulations, which are not inconsistent with the objectives of Title VI of the Civil Rights Act of 1964 and HUD regulations and requirements pursuant thereto.

Suitable vacancies arising at a given time at any location shall be offered to the eligible applicant first in sequence at such time.

d. . . . .
(1) . . . .
(a) If there is a suitable vacant unit in more than one location, the applicant shall be offered the unit at the location that contains the largest number of vacancies. If the applicant rejects the first vacancy offered he shall be offered a suitable unit at the location containing the next highest number of vacancies. If the applicant rejects three such offers, he shall be placed at the bottom of the eligible applicant list. The Local Au-

remained in effect since that time, the evidence shows that up until very recently the Local Authority has been in flagrant violation of both its own published plan and the HUD guidelines set out in note 9, supra, by maintaining a separate waiting list for the Lakeside project that has had the effect of keeping Lakeside occupied totally by Anglos since it opened.[10] Testimony was also received at trial, however, that the separate Lakeside list has now been discontinued and that the Housing Authority's present assignment procedures fully comply with HUD directives.

In justification of the relief sought, plaintiffs analogize the present posture of the Housing Authority to that of a local school board faced with the vestiges of a formerly segregated school system. Upon the authority of Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), they contend that the Housing Authority is "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch," 391 U.S. at 437–438, 88 S.Ct. at 1694, and cite subsequent Fifth Circuit school desegregation cases in support of their proposal for a desegregation plan to be implemented under the continuing supervision of the Court. The comparison appears in many respects to be quite accurate.

■ However, it is not clear at this time that the racial segregation now present in the public housing system will inevitably continue absent such a drastic measure. The Housing Authority now assigns its tenants on a non-discriminatory, community-wide basis that is strictly in accord with the HUD regulation, Low Rent Housing Administration of Program, RHA 7401.1, Chapter 9,

Section 1, Appendix 2. This directive, as the agency's interpretation of the requirements of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000d–1, enjoys a presumption of validity that has not been overcome in the record made before this Court, and thus cannot itself be declared unconstitutional. Moreover, the Housing Authority has officially resolved to locate future projects on scattered sites outside "East Austin" and, as shortly will be discussed, it may not yet and perhaps never lawfully build Project TEX1–9 on the site selected. These factors appear likely to effect substantial desegregation in the system. For these reasons, the Court denies the equitable relief requested by plaintiffs in their Second Cause of Action.

However, an order will issue enjoining the Housing Authority from departing in the slightest from the tenant assignment procedures it has published pursuant to HUD regulations. This measure appears necessary in light of the discriminatory effect produced by the Housing Authority's previous non-compliance with these requirements.

(c) Denial of Equal Opportunity Selection and Approval of the Project TEX1–9 Site.

■ Although the Court has found unnecessary any consideration of the constitutional issues presented in plaintiffs' Third Cause of Action, the evidence abundantly supports plaintiffs' claim that the procedures employed by the Housing Authority and by HUD in respectively selecting and approving the site for Project TEX1–9 were grossly inadequate to ensure that the national policy of equal opportunity in housing expressed in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Fair Housing Act of 1968, 42 U.S.C. §§

---

thority shall make all such offers in sequence and there must be a rejection of a prior offer before the applicant may be offered another location."

10. Testimony of Louise Adcock, Tenant Placement Officer of the Housing Au-

thority; Deposition of Louise Adcock at 12–13, 23–25; Testimony of George R. Brooking, Executive Director of the Housing Authority; Deposition of G. R. Brooking at 7–9; Testimony of H. J. Hodges; Deposition of H. J. Hodges at 38–40.

3601, 3608(d)(5), was considered and implemented in their decisions.

 While the Court does not take issue with the courts that have resolved related questions on constitutional grounds, e. g., Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971) and Gautreaux v. Chicago Housing Authority, 296 F. Supp. 907 (N.D.Ill.1969), the statutory approach based on the Civil Rights Acts of 1964 and 1968 adopted in Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970) and Hicks v. Weaver, 302 F.Supp. 619 (E.D. La.1969) forms an adequate basis for the decision reached here. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which the Court considers just as binding upon the Housing Authority as upon HUD, provides in part that "No person . . . shall . . . on the ground of race . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." The Fair Housing Act of 1968, 42 U.S.C. § 3608(d)(5), further imposes on HUD the duty to "administer the programs and activities * * * in a manner affirmatively to further" the open housing policy declared by the Act in 42 U.S.C. § 3601. Consequently HUD has, in its regulations interpreting Title VI of the Civil Rights Act of 1964 relating to housing, provided that:

> A recipient, in determining the location or types of housing, . . . which will be provided under any such program or activity, or the class of persons to whom, or the situations in which, such housing . . . will be provided . . . or the class of persons to be afforded an opportunity to participate in any such program or activity, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race . . . or have the effect of defeating or substantially impairing the objectives of the program or activity as respect persons of a particular race, color, or national orgin. 24 C.F.R. § 1.4(b)(2)(i).

In keeping with the emphasis on the discriminatory effect methods and criteria employed by local authorities may have, HUD has further provided, in its regulations governing site selection for public housing projects, that:

> . . . The aim of a local authority in carrying out its responsibility for site selection should be to select from among sites which are acceptable under the other criteria of this section those which will afford the greatest opportunity for inclusion of eligible applicants of all groups regardless of race, color, creed, or national origin, thereby affording members of minority groups an opportunity to locate outside of areas of concentration of their own minority group. Any proposal to locate housing only in areas of racial concentration will be prima facie unacceptable and will be returned to the Local Authority for further consideration and submission of either (1) alternative or additional sites in other areas so as to provide more balanced distribution of the proposed housing or (2) a clear showing factually substantiated, that no acceptable sites are available outside the area of racial concentration." Low Rent Housing Preconstruction Handbook, RHA 7410.1, Chapter 1, Section 1(2)(g).

This regulation has the force and effect of law, Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 89 S. Ct. 518, 21 L.Ed.2d 474 (1969), was in effect at the time the Project TEX1–9 site was approved, see Low Rent Housing Manual, Section 205.1, Paragraph 2.- g. (August 1968), and constitutes a presumptively valid interpretation of the requirements of 42 U.S.C. § 2000d, see Hicks v. Weaver, supra, 302 F.Supp. at 622. Thus, according to HUD's own interpretation of 42 U.S.C. § 2000d, federally-financed public housing may not be constructed in an area of racial concentration unless there is a clear, factually substantiated showing that no other acceptable site or sites are available outside the area. Whether

Sec. 2000d, or the Constitution, portends still more concerning the duties of local authorities and HUD in selecting and approving project sites this Court need not at this time decide; it is at least clear that the Housing Authority's action in selecting the site and HUD's action in approving it are subject to judicial review under the standard enunciated above.

In this connection, it has been held that HUD

. . . must utilize some institutionalized method whereby, in considering site selection . . ., it has before it the relevant racial and socio-economic information necessary for compliance with its duties under the 1964 and 1968 Civil Rights Acts,

and that

When an administrative decision is made without consideration of relevant factors, it must be set aside. Shannon v. HUD, 436 F.2d 809, 819, 821 (3d Cir. 1970).

The site for Project TEX1–9 finally selected by the Housing Authority and approved by HUD lies between Airport Blvd. and Bluestein Blvd. a few hundred yards north of the Colorado River and just south of Johnston High School, in the southeastern corner of the area of the city earlier described as "East Austin." It is obvious that neither the Housing Authority nor HUD ever used any "institutionalized method" to gather the racial and socio-economic data necessary for any meaningful determination as to whether this site was within an "area of racial concentration", much less whether other acceptable sites were available in the event that it was. Indeed, the Housing Authority during pretrial discovery thought the term "area of racial concentration" was "too vague and indefinite" to be applied to the site,[11] while HUD has candidly admitted that it cannot articulate any precise def-

inition of the term and that its procedure for defining the area of the site was "subjective."[12] And so the only contemporaneous administrative record of the factors considered would seem to indicate. There is nothing to indicate that the Housing Authority considered any racial or socio-economic factors at all in selecting the site, at least not within the context of the Civil Rights Acts. However, the Preliminary Site Report made up by HUD investigators following an inspection of the site in August 1968, reveals the following demographic data concerning the racial character of the site:

The site is located in a rural residential area but the residential area north of the site is integrated with some Negroes, Latins, and White residents.

This statement, together with a map showing the site selection was the sole response to Item 17 on the Preliminary Site Report form, which called for, inter alia, "racial patterns of residency in the locality of selected sites", "percentages of Negro and/or other minority populations," "sources of demographic information," and "location of existing public housing projects, schools and community facilities, and the predominant race of occupants or users of each in the locality of selected sites."[13] Since no inkling is here given of the factors considered by either agency in determining whether the project location met equal opportunity criteria, the Court permitted a factual inquiry during discovery and at trial into the mental processes of the administrators who, by selecting and approving the site, apparently determined that these criteria had been met.

Although this inquiry was not at all fruitful respecting the local defendants, it did produce some superficially amusing post hoc efforts by the federal defendants to define the "area" their in-

11. See Plaintiffs' Exhibit No. 43 at 105, No. 8.

12. Testimony of Harold Odom; Deposition of Harold Odom at 42–43, 89–98.

13. Plaintiffs' Exhibit No. 48; Local Defendants' Exhibit "O", Item 17.

vestigators considered in evaluating the equal opportunity aspects of the site. On motion for summary judgment, later withdrawn, federal defendants exhibited a map showing an area between Airport and Bluestein Blvds. that extended far enough north to include an almost exclusively Anglo area in northeast Austin bearing no functional relation whatever to the project site, but not far enough east to include the elementary and junior high schools, shopping centers and hospital nearest to the project site. Then at trial, HUD's official in charge of Title VI compliance, Mr. Odom, initially testified that he had evaluated the site in terms of the entire area earlier described as "East Austin". Upon closer questioning, however, he admitted that his recommendation to approve the site was based on a short automobile tour through a small area bounded on the north by the MKT Railroad, on the south and east by Bluestein Blvd., and on the west by Airport Blvd., during which he saw persons of varying races outside the residences he passed.

More disturbing still is the evidence that none of the HUD investigators obtained hard, reliable data showing the racial demography of any of these areas, even though 1960 census data, Austin Independent School District School Census data, prepared each year since 1948,[14] Austin Community Renewal Program data prepared by an agency partially funded by HUD,[15] and Neighborhood Analyses prepared by the City of Austin Planning Department [16] were readily available and could have been consulted. Plaintiffs, on the other hand, introduced abundant evidence showing that all three of the "areas" described by HUD were in fact populated in racial ratios grossly disproportionate to the overall ratio for the City of Austin,

which in 1969 was 74.2% Anglo, 14.4% Mexican-American, and 11.4% Negro.[17]

■ This Court will not substitute its judgment for that of the agencies by finding as a fact that on the dates the Project TEX1–9 site was selected and approved it lay within an area of racial concentration, although there is ample evidence in the record supporting this conclusion. That would amount to a de novo review of legislative agency action not permitted under these circumstances by the Administrative Procedure Act. This Court holds only that both the Housing Authority and HUD are charged with the affirmative obligation to further the national housing policy expressed in the 1964 and 1968 Civil Rights Acts and that, as in Shannon v. HUD, supra, the selection and approval of the Project TEX1–9 site "produced a decision which failed to consider that policy," 436 F.2d at 821, and must therefore be set aside.

The only method now prescribed by regulation by which HUD can obtain the information necessary to make an informed decision on the effects a proposed site will have on racial concentration, now appearing as Low Rent Preconstruction Handbook, RHA 7410.0, Chapter 1, Section 1, paragraph 6.b,[18] gives no notice to local housing authorities and no guidance to HUD personnel as to the criteria to be employed in determining such effects. Without in any way attempting to limit either the Housing Authority or HUD in the exercise of their administrative expertise, the Court suggests that some considerations relevant to a proper determination would include:

(1) The racial patterns of residency within the city as a whole, based on reliable sources of demographic data;

14. See Plaintiffs' Exhibit Nos. 32, 65, 83.

15. See Plaintiffs' Exhibit Nos. 8–12, 17b, 70, 98.

16. See Plaintiffs' Exhibit No. 69.

17. See Stipulation No. 42; Plaintiffs' Exhibit 47 at 18; Plaintiffs' Exhibit Nos. 44, 47, 65 (App. 10), 68–70.

18. See Government's Exhibit D, Low Rent Housing Manual, Section 205.1, paragraph 6.b (August 1968).

(2) The historical background of such patterns;

(3) The history of the local housing authority in selecting sites and assigning tenants;

(4) The location and racial residency pattern of low-income housing in the city as a whole, including both public housing and publicly-assisted housing;

(5) The boundaries of the "area" in which the project site under consideration is located, defined in functional terms by considering the proximity of the site to the community facilities that will serve it, such as schools, shopping centers, hospitals, libraries, parks and community centers;

(6) The racial composition of the "area" so defined, based on reliable sources of demographic data;

(7) The racial composition of the schools to be attended by children living in the project under consideration based on school census data and other sources;

(8) The probable race of the occupants of the project under consideration, as disclosed by waiting lists maintained by the local housing authority and other sources;

(9) The availability of other sites more favorably situated in respect to the above considerations than the site being evaluated.

In accumulating information bearing on these and other considerations deemed relevant, both the Housing Authority and HUD might profitably consult other local and federal agencies charged with similar responsibilities under the Civil Rights Acts. Much of the basic demographic data bearing on project site selection may be readily available from agencies engaged in concurrent Civil Rights enforcement efforts in other fields. Such intercommunication might also lead to a unity of approach between HUD and the United States Department of Health, Education and Welfare (HEW) that has been sadly lacking in recent litigation before this Court. HUD has vigorously contended in this suit that the racial mix in the neighborhood of the Project TEX1–9 site satisfies the requirements of the Civil Rights Act, while in a contemporaneous desegregation suit in this same Court HEW has contended with equal zeal that minority school children in the same neighborhood are so locked-in by segregated housing patterns that massive bussing is required to satisfy the Constitution.[19] The need for some inter-agency exchange of information and policies is obvious.

 Just what institutionalized procedures may be required to gather the information necessary for informed decisions are determinations best left to the expertise of the Housing Authority and HUD. At a minimum, however, such procedures should result in an administrative record showing the racial factors these agencies consider and the factual basis upon which they act in selecting and approving project sites.

(d) Environmental Aspects of the Project TEX1–9 Site.

In the Fourth Cause of Action, plaintiffs complain that the Project TEX1–9 site is not decent, safe and sanitary, as required by the Housing Act of 1937 and HUD regulations. By approving the project site, HUD determined these issues adversely to plaintiffs and there being sufficient basis in the contemporaneous administrative record to support these findings, the Court will not disturb them. The relief requested in the Fourth Cause of Action will be denied.

## CONCLUSION

This Memorandum Opinion shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## INJUNCTION

This action came on for trial before this Court, and the issues having duly

---

19. See United States of America v. Texas Education Agency (Austin Independent School District), Civil Action No. A–70–CA–80.

been tried and a decision having duly been rendered, it is ordered, adjudged and decreed:

(1) That the defendants Housing Authority of the City of Austin, its Board of Commissioners, its Executive Director and all persons acting in concert with them, or any of them, be, and hereby are, permanently enjoined from adopting, promulgating, administering or in any manner effectuating any policy or procedure for assigning eligible applicants for public housing operated or administered by the Housing Authority to particular projects within the system that is in any manner at variance with the guidelines published by the United States Department of Housing and Urban Development in the Low Rent Housing Administration of Program Handbook, RHA 7401.1, Chapter 9, Section 1, Appendix 2, as that regulation now exists or may in the future be modified by the Department of Housing and Urban Development, except any portion of said regulation that may subsequently be judicially declared unconstitutional or contrary to law; and

(2) That the defendants Housing Authority of the City of Austin, its Board of Commissioners, its Executive Director and all persons acting in concert with them or any of them be, and are hereby, permanently enjoined from continuing or commencing any work toward the construction of the Regular Family Public Housing Project, Project TEX-1-9, on the site selected by the Housing Authority, approved by defendant Morgan on January 8, 1969, and made the subject of this suit, and defendants George Romney, Secretary of the United States Department of Housing and Urban Development, and Richard Morgan, his Regional Administrator, or their successors in office, and their agents and employees, be, and hereby are, permanently enjoined from making any further payments to the Housing Authority for the continuing or commencing of any work toward the construction of the said Project TEX 1-9 on said site, until such time as both the local and federal defendants shall determine, in accordance with the guidelines of the Court contained in a Memorandum Opinion, and shall show to the satisfaction of this Court, either that the project site in question is not located within an area of racial concentration or, if the project site in question is in fact so located, that no other acceptable site or sites for Project TEX1-9 are available outside such area of racial concentration.

(3) That, pursuant to 28 U.S.C. § 1920, the Defendants Housing Authority of the City of Austin, its Board of Commissioners, its Executive Director, and all persons acting in concert with them, or any of them, be, and hereby are ordered to pay one half of the costs incurred on behalf of Plaintiffs, to-wit: $826.89, and Defendants George Romney, Richard Morgan, or their successors in office, and their agents and employees, be, and are hereby ordered to pay the remaining one half of the costs incurred by Plaintiff, to-wit: $826.90.