UNITED FARMWORKERS OF FLORI-
DA HOUSING PROJECT, INC., et al.,
Plaintiffs-Appellants,

v.

The CITY OF DELRAY BEACH, FLORI-
DA, et al., etc., Defendants-Appellees.

No. 72–3804.

United States Court of Appeals,
Fifth Circuit.

April 12, 1974.

Robert H. Graddy, Fla. Rural Legal Services, Delray Beach, Fla., Richard F. Bellman, Tarrytown, N. Y., for plaintiffs-appellants.

Robert D. Chapin, Atty., Delray Beach, Fla., Kenneth F. Hoffman, Asst. Atty. Gen., for Dept. of Pollution Control, Dept. of Legal Affairs, Tallahassee, Fla., John C. Randolph, Atty. for Palm Beach County Area Planning Bd., West Palm Beach, Fla., for defendants-appellees.

Before THORNBERRY, GODBOLD and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal arises out of a suit brought by the United Farmworkers of Florida Housing Project, Inc., and individual farmworkers against the City of Delray Beach, Florida, and the members of its city council, the Palm Beach County Area Planning Board and its director,

and the Florida Department of Pollution Control and its director. Representatives of minority farmworkers are attempting to build a federally assisted, low income housing project in Palm Beach County, Florida. So far their efforts have been stymied by the refusal of the City to permit the proposed project to tie into the City's existing water and sewer systems. Their complaint alleges that the City's refusal was racially discriminatory and had the purpose and effect of depriving black and brown farmworkers of equal protection under the fourteenth amendment and of rights secured by federal civil rights statutes. The complaint further alleged that the Palm Beach County Area Planning Board and the State's Department of Pollution Control had illegally acquiesced in the racial discrimination practiced by the City and its officials by processing and approving the City's application for federal funds to be used to construct new waste treatment facilities.

The district court consolidated a preliminary injunction hearing with a full trial determination of the merits of the farmworkers' claims and found (1) that the City had rejected the farmworkers' request for "valid; municipal purposes," its zoning and annexation policies, (2) that the farmworkers had presented "no satisfactory evidence of racial or ethnic discrimination," (3) that there was "no evidence sufficient to shift to the City the burden of showing the absence of racial or ethnic discrimination," and (4) that the farmworkers were not entitled to bring this action as a class action.

On this appeal, the farmworkers are contending (1) that the district court applied incorrect standards in determining that there was an absence of discrimination, (2) that no compelling governmental interest has been offered to explain the denial of water and sewer services, (3) that the City's refusal to grant the needed permit violates the federal Fair Housing Act of 1968, (4) that the Florida Department of Pollution Control and the Palm Beach County Area Planning Board have illegally ac-

quiesced in the City's discrimination, and (5) that appellants were entitled to proceed as a class.

This is a case of some complexity involving the duties of municipalities and state agencies, land use planning, zoning, national housing policy, and racial discrimination. Once the factual setting is described with some precision, however, the resolution of the legal issues is clear. We reverse in part, and vacate and remand in part.

### Jurisdiction

The farmworkers have contended that this action arises under the fifth, thirteenth, and fourteenth amendments of the Constitution; the general federal question jurisdiction statute, 28 U.S.C. § 1331; the old Civil Rights Acts, 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981, 1982, and 1983; and Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), and 3612(a).

While this case was pending on appeal, the Supreme Court held that a municipality is not a "person" within the meaning of that term in 42 U.S.C. § 1983 and therefore not a proper party defendant in a suit brought to secure injunctive relief for deprivations of § 1983 rights. City of Kenosha v. Bruno, 1973, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109. The Court had earlier held that a municipality is not a "person" within § 1983 for purposes of securing money damages. Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. Thus the City of Delray Beach is not a proper party if the sole jurisdictional basis is 28 U.S.C. § 1343 and 42 U.S.C. § 1983. And the same would appear to be true for the Palm Beach County Area Planning Board and the State Department of Pollution Control. *See* Moor v. County of Alameda, 1973, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596; Note, 87 Harv.L.Rev. 252, 258 (1973).

■ But it is clear that *Kenosha's* holding turned on the particular legislative history of the Civil Rights Act of

1871, the precursor of § 1983. Relying solely on the analysis of the Act's legislative history in *Monroe*, the Court concluded that "Congress did not undertake to bring municipal corporations within the ambit of" § 1983 for the purpose of securing either damages or injunctive relief.[1]  93 S.Ct. at 2226.  The Court was careful not to exclude the possibility that the City could be a properly named defendant under the general federal question jurisdiction statute, if the requisite jurisdictional amount were present, a matter to be determined upon remand.[2]  Thus the opinion does not stand for the proposition that a municipality can never be sued for deprivations of civil rights.

In the instant case, we have had the benefit of neither briefs, arguments, nor findings by the district court on the subject of the City's presence under some other jurisdictional statute, such as the Fair Housing Act, 42 U.S.C. §§ 3604, 3612(a), or the general federal question statute, 28 U.S.C. § 1331.  Under the circumstances, however, we need not decide the question thus posed, for the individually named city council members and the other named individual defendants are clearly proper parties under both § 1983 and the Fair Housing Act.  Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; Harkless v. Sweeny Independent School District, 5th Cir. 1970, 427 F.2d 319, 323, cert. denied, 1971, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439; Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506; Gates v. Collier, 5th Cir. 1973, 489 F.2d 298; Alexander v. Kammer, E.D.Mich.1973, 363 F.Supp. 324, 325; Citizens Committee for Faraday Wood v. Lindsay, S.D.N.Y.1973, 362 F. Supp. 651, 653.  And the injunctive relief which we grant against the city council members in their official capacities will surely be felt by the City.[3]  Because of the complex posture of this case and because of the urgency with which this appeal has been urged, it would be both an injustice and an irresponsible waste of judicial resources to refuse to reach the merits of the case.  The jurisdictional question must be decided, but under the circumstances, we choose to let the district court make that determination in the first instance.[4]

1. Section 1343 requires that the cause of action be "authorized by law."  Unless the plaintiff can show that his cause of action falls within the language of § 1983, he cannot aver that the action is one "authorized" by that statute.  Since suit against a municipality is not authorized by the statute, there is no jurisdiction under § 1343.  Note, 87 Harv.L.Rev. 252, 254 (1973).

2. *See* City of Kenosha v. Bruno, *supra*, 93 S.Ct. at 2227; *see also* the concurring opinion of Justices Brennan and Marshall, Id. at 2228; Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939; Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 1971, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619.

3. The importance of the City's presence as a named party defendant lies in the fact that relief against the City officials may not always provide a complete substitute for relief against the City itself, and may have an uncertain res judicata effect.  We would, however, look with some disfavor upon any City official's actions which were inconsistent with this opinion.

4. Although the farmworkers alleged in their complaint that more than $10,000 was in controversy, the City answered by putting the appellants to their proof as to the amount in controversy.  We cannot say on this state of the record whether the requisite amount is involved, and thus it is appropriate for the district court to decide that question.

The farmworkers have also alleged that the City has violated the Fair Housing Act. Section 3612(a) provides that the rights granted under the Act may be enforced "by civil actions in appropriate United States district courts without regard to the amount in controversy."  Section 3604 provides in part that

. . . it shall be unlawful—

\* \* \* \* \*

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

The Act defines a "dwelling" to include vacant land on which one or more residential

## The Farmworkers' Request

The City of Delray Beach is a community of some diversity, located along the southeast Florida coast in Palm Beach County. Like other towns on the coast, Delray Beach offers many of its residents the comforts of sunshine and relaxed living. To the west of the City, however, lie migrant labor camps, where the style of living is not nearly so comfortable.

Out of a total population of about 350,000 in Palm Beach County, there are approximately 40,000 farmworkers, virtually all of whom are black, Mexican-American, or Puerto Rican. Some of these farmworkers live in the migrant labor camps, while others live in segregated communities in the City of Delray Beach.

Of Delray Beach's 1970 population of 19,366, almost 8,000 were black or brown, and of those, 6,400 reside in the City's segregated community, Planning Unit Five. The City recently stated that there is a great shortage of safe and sanitary housing for its low income people, that dilapidated and dangerously unsafe housing, approaching crisis proportions, is a particularly acute problem in Planning Unit Five, and that 21% of the City's households have incomes below the federally recognized poverty level of $3,000. It is undisputed that the need for low income housing in Delray Beach and in Palm Beach County is critical and desperate.

Recognizing the enormity of the problem, appellants applied for funds to build a low income housing project for farmworkers pursuant to a program of federal financial assistance administered by the Farmer's Home Administration of the Department of Agriculture.[5] Under this federal program, the FmHA provides for up to 90% of the total development costs of the project in the form of an outright grant and up to 10% of the costs in the form of a loan. This particular program of assistance is available only to farmworkers and is specifically directed to their fluctuating low income situation. At the FmHA's request, the United Farmworkers of Florida Housing Project, Inc., was formed to aid in the processing of the funding application.

Representatives of the farmworkers sought to locate a site which met FmHA specifications and which was suitable for the construction of the desired low

units are proposed to be constructed. 42 U.S.C. § 3602(b); United States v. Grooms, M.D.Fla.1972, 348 F.Supp. 1130, 1133. If the City is "within the ambit" of § 3604, then it is properly a named defendant under the Fair Housing Act. Since that is a question which turns on both the express words of the statute and the legislative intent, and since the parties to this suit have not had an opportunity to argue the issue, we believe the district court is the proper forum for the discovery of the answer.

The district court may also wish to consider the suggestion of the farmworkers that jurisdiction exists under 42 U.S.C. § 1982. See Sullivan v. Little Huntington Park, Inc., 1969, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386; Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189.

Assuming that the reasoning of *Kenosha* is not limited to municipalities but applies to all agencies of state and local government, we believe that the district court should also consider the jurisdictional status of the State Department of Pollution Control and the Palm Beach County Area Planning Board.

The district court suggested in its order denying relief that the Palm Beach County Area Planning Board is not a proper party to this suit because, under the laws of the State of Florida, it is not a legal entity with the power to sue or to be sued. We cannot determine from the district court's order, however, whether consideration was given to F.R.Civ.P. 17(b)(1), which provides that an "unincorporated association" is a properly named defendant, notwithstanding contrary state law, whenever a federal substantive right is in issue. United Mine Workers of America v. Coronado Coal Co., 1922, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975; Moore, Federal Practice ¶ 16.25 at 851 et seq. Since it is clear that a federal substantive right is involved, on remand the district court should make explicit findings as to the capacity of the Board, and whether it qualifies as an "unincorporated association," under this rule.

5. See 42 U.S.C. § 1471 et seq.

income housing. The farmworkers initially acquired an option on a parcel of land considerably west of the urban growth of Palm Beach County. But the FmHA rejected the site because it was not adjacent to an urban community with schools, libraries, shopping centers, parks, and ready access to water and sewer facilities.

A five-acre parcel, contiguous to the City's corporate boundary line but lying within the unincorporated county, was secured by an option on July 19, 1972.[6] The site met the requirements of the project and of the FmHA: at that time it was zoned by the county for multiple family dwellings at a density of up to thirty-two units per acre; the site was adjacent to an elementary school and near community services; the price of the land was compatible with the contemplated federal funding for the project; and the parcel was within 800 feet of existing facilities for water and sewer services.[7]

A farmworkers' representative first met with a city official to discuss the project on April 13, 1972. At that time, the City's Director of Public Utilities advised the representative that there would be no problem in securing water and sewer services for the parcel since the City's water line ran directly by the property and since the City's sewer line was only 800 feet away. Evidently, however, at that first meeting, no mention was made of the fact that low income farmworkers' housing was contemplated.

On May 3, 1972, the farmworkers formally requested that the City provide a letter of confirmation stating that the City would provide the necessary water and sewer services. In their request,

the farmworkers stated that the project would pay for all connection costs, such as pumping and connecting lines, and asked that the services be provided without annexation. The letter of confirmation was required before the FmHA would give the project its final approval.

On May 18, 1972, the city council considered the farmworkers' request at an informal public workshop session. A farmworkers' spokesman explained the nature and purpose of the project in detail. Councilwoman Martin stated several times during the meeting that the City should not provide services to "those people" because they would be "undesirable" residents. After the discussion, the city council referred the request to the City's planning and zoning board for review and recommendation.

On June 20, 1972, the planning and zoning board recommended that the farmworkers' request be denied for two reasons. First, the tentatively adopted Master Land Use Plan designated the property in question for use as a park. Second, if the property were not to be used for park purposes, the density of dwellings on the property should not exceed six units per acre, far below the farmworkers proposed density of fourteen to eighteen units per acre.

The matter came before the city council for final consideration and action on June 26, 1972. At that meeting, council members expressed concern over the farmworkers' request that an agreement to annexation not be a condition to the City's granting of services. Council members also noted that the proposed project violated the density limits set forth in the Master Plan. In response, a farmworkers spokesman stated that the farmworkers were opposed to annex-

6. The option was subsequently exercised; the obligation to purchase the property was transferred to the American Friends Service Committee, Inc., which obtained title to the property by warranty deed on May 7, 1973; and the American Friends Service Committee, Inc., thereupon conveyed to the farmworkers an irrevocable option to purchase the property.

7. The appellants stated that the project had been given a high funding priority by the FmHA, because if and when it is completed, it will be the first successful undertaking of this type for farmworkers in the state and the first under the FmHA program.

ation only because the property had appropriate zoning from the county for just such a project, and that there would be no objection to annexation if the City would respect the County zoning designation. The city council voted 4–1 to deny the request officially, and this suit followed.

The only point in contention before the district court and the only dispute before us concerns the refusal of the City to allow the farmworkers to tie into the City's existing sewer and water lines. The district court concluded that the farmworkers had produced "no satisfactory evidence of racial or ethnic discrimination," and that there was "no evidence sufficient to shift to the City the burden of showing the absence of racial or ethnic discrimination, even upon the concepts of 'historical context,' or 'immediate objective' or 'ultimate effect.'" The surface complexity of the factual setting and background requires that we set out the evidence in full.

### City, County, and Federal Relations, and the Regional Plan

Much of the testimony presented in the hearing below concerned the responsibilities of the City to the farmworkers' proposed project and the City's capacity or authority to provide the requested services. In this regard, much was said about the Regional Plan, the State of Florida's response to an invitation contained in the Federal Water Pollution Control Act Amendments of 1972. These amendments offer substantial grants, for the purpose of constructing water pollution abatement and sewage treatment facilities, to states which have formulated plans of regional or area waste treatment management.[8]

Pursuant to a state executive order, the Palm Beach County Area Planning Board, legislatively created in 1965 to plan for the proper development of the county, was designated an agent of the State Department of Pollution Control for the express purpose of formulating a plan for a regional system of water distribution and sewage collection and treatment. The county was divided into geographical areas which would be provided with water and sewer services by designated "service agents." The City of Delray Beach was designated service agent for one of these areas, an area which included the farmworkers' parcel.

The City accepted its designation. And on May 2, 1972, based on the state's approval of the Regional Plan and certification that the plan met the requirements of the federal law, the City applied for a federal grant to construct a new water pollution abatement and sewage treatment facility. The City certified in its federal application that, in meeting the requirements for federal funding assistance, the City would provide water and sewer service without condition to all applicants within the area designated as its service area. The district court found that in order for the City to receive the federal grant, it would be necessary for the City to treat and dispose of sewage generated in this service area, a rather wide area west of the City's incorporated limits. The attorney for the State Department of Pollution Control stated at the hearing below that the City's application for federal funding would not have been approved by the State without the City's unconditional agreement to serve all within its service area.

At the hearing, however, City Manager Mariott testified that while the City has a duty to serve all within its designated area, it does not have a duty to extend its water and sewer transmission lines or to provide additional pumping facilities to those outside its incorporated area. That obligation, he stated, falls on the shoulders of a "subagent," an entity yet to be appointed. Be that as it may, the fact that a subagent has not been appointed is irrelevant to the farmworkers' request since the farmworkers have agreed to play that role: the farmworkers have agreed from the

8. *See* 33 U.S.C. § 1251 et seq. (1973).

outset to provide the means for tying into the City's existing system. All that was and is required of the City is the permit to tie into the existing municipal system.

In explaining the City's relationship with the state, the City has also argued that the state has forbidden further extensions of the City's sewer service because the present system is inadequate to meet state pollution control standards. The City introduced evidence below suggesting that the state now requires sewage facilities to meet a 90% efficacious treatment level, while the City's present facilities can provide no better than 35% treatment. But the Department of Pollution Control pointed out, without rebuttal from the City, that the Department has, with the Governor's authorization and imprimatur, directed cities to allow low income housing projects to be hooked up to existing systems in order that needed projects will not be delayed or defeated.

The dispute over the capacity or authority of the City to serve the proposed project thus resolves itself into no dispute at all. In fact, City Manager Mariott testified that the farmworkers' request was not rejected for any reason of ability or capacity to furnish the services. The City further admitted that it has the authority to service parties outside its incorporated area and that it has a duty to process sewage for and to provide water to anyone legally tying into the existing facilities.

### The City's Policy on Annexation

Delray Beach has contended, and the district court found, that the City's annexation policy offered a valid reason for refusing the farmworkers' request. Representatives of the City testified that Delray Beach has a long-standing policy of requiring annexation as a condition for extending water and sewer lines to areas outside the City limits. In 1962, the City adopted a resolution providing that an outside-the-city applicant must agree to annexation as a condition to the City's extension of water service. The City has not adopted a similar resolution on the subject of sewer service, although its representatives stated at the hearing below that a similar, albeit nonformalized, requirement of annexation is insisted upon where sewer service is requested. City ordinances have been adopted which set rates both for water and for sewer services outside the City. They make no mention of any annexation condition.

The City has made at least five recent exceptions to its annexation requirement which suggest to us that the annexation policy is not a rigid one. At the behest of a white representative, the Del Raton Mobile Home Park was granted city services in May of 1972 without any condition of annexation and in spite of the fact that there was no zoning category for mobile home parks. In the summer of 1972, the City purchased the water and sewer system of the Delray Shores subdivision, at the time an almost exclusively white subdivision of 150 to 200 individual homes lying outside the City's limits. The City has since provided the subdivision with water and sewer service without any requirement of annexation and has billed each user individually. Additionally, the City has obligated itself to provide the same services, without annexation, to some 700 undeveloped acres of the same subdivision. Since 1969, the City has been furnishing the separately incorporated Town of Highland Beach with sewer service. The town is affluent and exclusively white, and 80% of the town's residences are multifamily apartments and condominiums. In 1970, the City began providing the Bath and Tennis Club of the separately incorporated Town of Gulfstream with sewer service. And since 1969, the City has been furnishing the home of Kenneth Murray, located in a white neighborhood, with both water and sewer service. The evidence clearly demonstrates that the City has made exceptions to its annexation requirement for whites, but it would not do so for these minority farmworkers.

With that discovery, we come to an important piece of the evidentiary puzzle, the Master Land Use Plan.

## The Master Land Use Plan

Prior to April 1972, the City had no master land use plan, and its zoning authority was limited to its incorporated area. On April 24, 1972, the City adopted "in principle," and in October 1972 formally adopted, a Master Land Use Plan which not only exercised the City's existing zoning authority but also suggested the proper development of a ten square mile area adjacent to its western border known as its "reserve area." The reserve area consists of that land which may be annexed to the City of Delray Beach but to no other municipality and in which no other municipalities may be formed. Until the property is actually annexed, the City has no authority to limit or control the actual use of this land, and the county retains full zoning responsibility and authority. Nevertheless, the City does have the responsibility for suggesting the proper development of the reserve area. And as evidenced by this case, the City's desires are significant where municipal services are needed.

Mr. James Smoot, Delray Beach's City Planner for the previous two years and an expert in the field of urban planning, testified for the farmworkers at the district court hearing. He worked on the Master Plan almost from its inception and assumed full responsibility for its preparation in the spring of 1971. He prepared the original drawings of the Plan and presented them in public hearings in March 1972. Smoot's draft of the Plan had proposed a park for the farmworkers' parcel and a medium density, multifamily residential use for the surrounding land area. The medium density designation was compatible with the number of units per acre contemplated by the farmworkers' proposal. Smoot resigned his position with the City on April 3, 1972, to become the chief zoning official for Palm Beach County. Sometime after April 3 and before June 20, 1972, when the zoning and planning board recommended that the farmworkers' request be denied, the Plan was changed so that the area surrounding the farmworkers' parcel was designated for single family dwellings.

Smoot testified that the "Germantown pocket," of which the farmworkers' parcel is a small part, is a "transitional area" of some 300 acres for which no one appropriate future land use has been definitely indicated by the area's present development. The pocket is 90% undeveloped. To the north of the farmworkers' parcel is the City's historically segregated black community, known as Planning Unit Five. And immediately to the south of the pocket is an exclusively white residential development of both multifamily and single family dwellings known as Tropic Palms. Although he testified that no one land use was compelled, Smoot described the single family use proposed for the pocket as "inconceivable." Smoot also testified that the county had, for many years, zoned this parcel and the surrounding land for high density, multifamily residential use, that the county had just recently reviewed the present zoning designation for the pocket and for all county lands, and that the county had again concluded that multifamily residential, albeit medium density, zoning was appropriate for the land in question. The City did not present evidence to explain why or when Smoot's designation for the use of the property was changed. The district court called Smoot "a bright, knowledgeable and credible witness."

Since the very recent adoption of the Master Plan, the City has already made two significant exceptions to it. Smoot testified that a Master Plan "single family dwellings" designation for an 80-acre tract (the Brae property) was rezoned "multifamily" to allow a white developer to construct multifamily dwelling units. The City's turn-about conflicted not only with its own just-adopted Master Plan, but also with the county's zoning for the acreage. Additional-

ly, a 36-acre tract (the Muroff tract) which had been designated for single family use in the Master Plan has been redesignated for multifamily use at the request of a white real estate developer and in spite of the City Planner's recommendation that the parcel remain low density. These deviations from a Master Plan with so short a life indicate to us that the City's land use policy, like its annexation policy, is not an unalterable one.

## The Threshold Determination of Discrimination

### The Duty of the City to Provide the Requested Services

■ We should note here that the farmworkers' appeal is not based primarily upon a claim of a denial of a fundamental right to decent housing, *see* Lindsey v. Normet, 1972, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36, 50, or upon a claim of discriminatory treatment engendered by suspect wealth classifications, *see* San Antonio Independent School District v. Rodriguez, 1973, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, although it is undisputed that the vast majority of farmworkers lack decent housing and are impoverished. Rather, the farmworkers' appeal is based upon a claim of racial discrimination. And that is the claim to which we direct our most careful attention. For while the law with regard to decent housing or with regard to classifications based on wealth may still be in flux, it cannot now be doubted that under our Constitution, distinctions in treatment based on race are inherently suspect. *See* Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222; Loving v. Virginia, 1967, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010.

■ In that context, we recognize that once a municipality begins to offer services beyond its incorporated area, it can no more refuse those services to an "outsider" for racial reasons than it can refuse those services for racial reasons to one of its very own residents. While a city may have no obligation in the first instance to provide services to anyone outside its geographical limits, once it begins to do so, it must do so in a racially nondiscriminatory manner. Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Palmer v. Thompson, 1971, 403 U.S. 217, 222, 91 S.Ct. 1940, 29 L.Ed.2d 438.

■ In the light of this duty, we believe that the district court's threshold determination of "no satisfactory evidence of discrimination" is clearly erroneous. For the evidence presented below clearly demonstrates that the effect of the City's action was racially discriminatory: minority citizens' requests were refused while white citizens' requests were granted. It was undisputed below that the City has made exceptions to its annexation requirement for whites. The City would not do so for these minority farmworkers. It is also undisputed that the City has changed its Master Land Use Plan designations for whites. Again, the City would not do so for these farmworkers. From this alone, it is clear to us, and it should have been clear to the city officials, that the effect of their refusal was racially discriminatory. To prove a prima facie case of racial discrimination, no more is required. Hawkins v. Town of Shaw, 5th Cir. 1972, 461 F.2d 1171, 1172–1173 (en banc); United States v. Pelzer Realty Company, Inc., 5th Cir. 1973, 484 F.2d 438, 443; Burton v. Wilmington Park Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; Dailey v. City of Lawton, 10th Cir. 1970, 425 F.2d 1037–1039; Banks v. Perk, N.D.Ohio 1972, 341 F.Supp. 1175, aff'd in part, rev'd in part, 6th Cir. 1973, 473 F.2d 910; Kennedy Park Homes Ass'n v. City of Lackawanna, 2nd Cir. 1970, 436 F.2d 108, cert. denied, 1971, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546; Norwalk CORE v. Norwalk Redevelopment Agency, 2nd Cir. 1968, 395 F.2d 920, 931.

The City's explanation for granting services to some without requiring an-

nexation is that the City had no other alternative: a health hazard would have been created by a City refusal. We fail to see the logic of this argument, for had the farmworkers built their project without a letter of confirmation on services, a similar health hazard would have been created by a City refusal. The City has suggested that the Brae property developer has agreed to limit the density of the development to those densities prescribed by the original Master Plan, but no evidence of that agreement was introduced below and, in any case. the City does not dispute the fact that the Master Plan was changed to accommodate the white developer. The City gave no explanation whatever for the Muroff property deviation from the Master Plan.

■ The City's explanation is consequently a nonexplanation for purposes of dispelling the existence of a racially discriminatory effect. Once the existence of a racially discriminatory effect is thus proven, the City must bear the heavy burden of demonstrating that its refusal, and resulting discrimination, were necessary to promote a compelling governmental interest. In re Griffiths, 1973, 413 U.S. 717, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910; McLaughlin v. Florida, *supra*; Loving v. Virginia, *supra*; Kramer v. Union Free School District, 1969, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; Hawkins v. Town of Shaw, *supra*; Crow v. Brown, N.D.Ga.1971, 332 F. Supp. 382, 390, aff'd, 5th Cir. 1972, 457 F.2d 788.

### The City's Justification for its Racial Discrimination

The only interests which the City has seriously suggested as "compelling" are faithfulness to its Master Plan and faithfulness to its annexation policy. But when we recall that the City has already made significant exceptions to both its land use and its annexation policies, this contention loses much of its force. And when considered in the context of the Regional Plan and the City's application for federal funds, the claim loses any vigor that remained.

The district court found that if and when the City receives the federal funding and constructs the new facilities,

. . . the City would be obligated to serve the land in question, and this would be true regardless of the City's requirements for annexation or zoning . . .

The district court further found that

. . . it is reasonable to infer that the City's application for Federal funds may not be granted if the City denies sewage service on a basis of non-annexation or non-compliance with its zoning requirements . . .

The City agreed to act as service agent in the Regional Plan, promised to serve all within its service area, and applied for federal funds, ostensibly because the prospect of new, effective facilities augured well for the City and the surrounding area. We find it hard to believe that the City would threaten its chances to comply with state pollution abatement requirements or to receive federal funds which would benefit thousands of persons, including its own residents, just so that it might hold fast to annexation or land use policies which it has already ignored in the past and which, if the funds are awarded, it must ignore in the future. Why we should accept these annexation and land use policies as adequate, much less compelling, explanations when neither the state nor the federal government would, the City has never explained.

Furthermore, the City produced no evidence to suggest that the placement of the park directly upon the farmworkers' parcel was necessary to safeguard the integrity of its Master Plan. In contrast, the appellants offered the undisputed testimony of City Planner Smoot who stated that the park could be located elsewhere in the Germantown pocket. Appellants also elicited unchallenged testimony that the single family land use designation for this area was not merely

not necessary, since the land was largely vacant, but "inconceivable."

Moreover, the appellants did not rest their case on the racially discriminatory effect of the City's refusal. They went on to offer evidence of the "historical context" and the "ultimate effect" of the City's actions, both of which are highly relevant considerations in judging the City's present refusal. The most potent evidence concerns the City's past practices with respect to low income housing.

In spite of the generally recognized need for low income housing, there are only 295 completed low income housing units in the City. A large project of 208 units, with funding assistance provided through § 221(d)(3) of the National Housing Act of 1961,[9] is in construction. But this multifamily dwelling project, like almost all of the low income housing in Delray Beach is located in Planning Unit Five. In fact, 486 of the 503 finished and unfinished units are in the segregated area. Furthermore, all of the completed units are single family dwellings constructed under § 235 of the Housing and Urban Development Act of 1968.[10] It was undisputed below that farmworkers cannot afford § 235 housing. That is one reason why the farmworkers sought assistance through the one program which is directed exclusively to their needs and resources.

The appellants also pointed out below that the farmworkers' effort to secure City services for a federally subsidized housing project for this same five-acre parcel is not the first such attempt. In 1971, an applicant sought water and sewer services for a proposed § 235 (12 U.S.C. § 1715z (1970)) housing project for the very same parcel of land. The housing had a proposed density of eight units per acre.

The City's planning and zoning board approved the request. City Planner Smoot was "enthusiastic" about the proposal. The city council, however, had misgivings about the project and decided to resubmit the request to the planning and zoning board for further consideration. On this second time around, the board split 3–3 on the request, with one member absent.

City Councilwoman Martin called Smoot to find out what his recommendation to the council would be. After being told that he was not ready to make a recommendation, she asked if he were aware that "colored people" would be living in the proposed project. During this same time period, then-city councilman, now-Mayor Scheifley stated that there was no possibility that a project of that sort would be built in the Delray Beach area.

At the next city council meeting, on Councilwoman Martin's motion, the council voted to deny water and sewer service to the site, even though the applicant had agreed to annexation and had agreed to pay for the costs of connection to the existing system. City Manager Mariott testified at the hearing below that the 1971 request was denied because the proposed density of eight units per acre was incompatible with the City's "wishes." At that time, however, the City had no zoning or land use plan for unincorporated areas, and the county had zoned the parcel for up to thirty-two units per acre.

The ultimate effect of the City's past and present conduct is three-fold: first, the confinement of low income housing construction to the segregated area of the City; second, a further reinforcement of segregation in the City because minority citizens in disporportionate numbers live in low income housing; and third, a frustration of efforts to construct housing which farmworkers can afford. These consequences are par-

9. *See* 12 U.S.C. § 1715*l*(d)(3) (1970); Mixon, Housing Subsidies, Impoundment, and Equal Protection, 10 Houston L.Rev. 793, 809–10 (1973).

10. *See* 12 U.S.C. § 1715z (1970); Mixon, Housing Subsidies, Impoundment, and Equal Protection, 10 Houston L.Rev. 793, 812 (1973); 2 U.S.Code Cong. & Admin.News pp. 2875–2883 (1968).

ticularly distressing because, in the realm of federally assisted housing, local authorities have an obligation to further the national policy of balanced and dispersed public housing and to refrain from frustrating efforts to carry out that policy. Crow v. Brown, N.D.Ga. 1971, 332 F.Supp. 382, 390, aff'd, 5th Cir. 1972, 457 F.2d 788.[11] The City's past and present low income housing actions are, at the very least, inconsistent with this policy, and this inconsistency adds historical force to the farmworkers' claim against the City and its officials.

The situation presented here is in many respects similar to that which faced the Second Circuit in Kennedy Park Homes Ass'n v. City of Lackawanna supra. There minority citizens wished to build a low income housing project in a predominantly white section of the city, rather than in their black ward. The city refused the applicants permission to tie into the city sewer system, a condition precedent to the construction of the housing. The city argued that the refusal did not amount to discriminatory treatment, or alternatively, that the refusal was compelled because of the "high residential density" in the area, because of a "moratorium on new subdivisions," because the area was the "only" available land left in the city for park purposes, and because otherwise a critical health problem would develop from inadequate sewage facilities. In light of evidence which demonstrated not only discriminatory effect but also discriminatory purpose, former Supreme Court Justice Clark, sitting by designation and writing for the court, held that the city had failed in its burden of dem-

onstrating that a compelling governmental interest existed to support the refusal.

■ In light of the exceptions to a Master Plan of so short a life span; the timing of the Master Plan's adoption; the changes in City Planner Smoot's designation for the use of the area without explanation; the conflict between the City's Master Plan designation and the county's long-held and recently reviewed zoning designation for the subject property; the exceptions to the annexation policy; the inconsistency of the City's position in the face of its offer to serve its entire designated area; Councilwoman Martin's statements; the denial of the 1971 application for low income housing in spite of the applicant's agreement to submit to annexation and to pay all connection costs and in spite of the non-existence of a City zoning plan for unincorporated land; the desperate need for low income housing for farmworkers; and the concentration of almost all low income housing in a segregated area, we are convinced that the City failed to meet its burden of proving that its refusal was necessary to promote a compelling governmental interest, and thus that the city officials have deprived the farmworkers of equal protection of the law under the fourteenth amendment.[12]

The Other Defendants:

The Palm Beach County Area Planning Board and Its Director

The State Department of Pollution Control and Its Director

The farmworkers alleged below that the Area Planning Board and the State

11. See also Kennedy Park Homes Ass'n v. City of Lackawanna, supra; Dailey v. City of Lawton, supra; Shannon v. HUD, 3rd Cir. 1970, 436 F.2d 809, 821; Gautreaux v. Romney, 7th Cir. 1971, 448 F.2d 731, 738; Gautreaux v. Chicago Housing Authority, N.D.Ill.1969, 296 F.Supp. 907, enforced in 304 F.Supp. 736, aff'd, 7th Cir. 1970, 436 F.2d 306, cert. denied, 1971, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661; Hicks v. Weaver, E.D.La.1969, 302 F.Supp. 619; Blackshear Residents Organization v. Hous-

ing Authority of City of Austin, W.D.Tex. 1972, 347 F.Supp. 1138; Mahaley v. Cuyahoga Metropolitan Housing Authority, N.D. Ohio 1973, 355 F.Supp. 1257, 1264; 42 U.S. C. § 2000d (1964); 42 U.S.C. § 3601 (1968).

12. Because we find a violation of the fourteenth amendment and § 1983, we do not reach the question of whether the city officials' conduct also constituted a violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. See Note 4, supra.

Department of Pollution Control illegally acquiesced in the City's racial discrimination.[13] The district court made no explicit findings on discrimination with respect to these defendants because of the court's conclusion that the City had engaged in no racial discrimination. In light of our conclusion that the city officials have engaged in impermissible racial discrimination, we believe that the best course is to remand the question of illegal acquiescence to the district court for findings, or if needed, further evidentiary proceedings.

### The Denial of Class Action Status

■ The district court refused to allow the appellants to proceed as a class "because the plaintiff nonprofit corporation could adequately represent all persons within any such class" of farmworkers and because "notification to all of the proposed members of the designated class would have complicated and delayed resolution of the controversy, unnecessarily." Appellants contend that the district court abused its discretion in denying class action treatment pursuant to F.R.Civ.P. 23(b)(2), which includes no notification requirement and which affirmatively includes a requirement that the named parties will fairly and adequately protect the interests of the class. We find it unnecessary to determine the answer to this question, however, for whether or not appellants are entitled to class action treatment, the decree to which they are entitled is the same. As we said in Bailey v. Patterson, 5th Cir. 1963, 323 F.2d 201, 206, cert. denied, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609, the very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of the named plaintiffs but also for all persons similarly situated. *See also* United States v. Hall, 5th Cir. 1972, 472 F.2d 261, 266. For racial discrimination is by definition class discrimina-

tion. Huff v. N. D. Cass Company of Alabama, 5th Cir. 1973, 485 F.2d 710, 713 (en banc). Even with the denial of class action status, the requested injunctive and declaratory relief will benefit not only the individual appellants and the nonprofit corporation but all other persons subject to the practice under attack. *See* Wright and Miller, Federal Practice and Procedure § 1771 at 663–64; Park View Heights Corporation v. City of Black Jack, 8th Cir. 1972, 467 F.2d 1208; *see also* Norwalk CORE v. Norwalk Redevelopment Agency, *supra*, 395 F.2d at 937; Crow v. Brown, *supra*; Hicks v. Weaver, *supra*; Sisters of Providence of St. Mary of the Woods v. City of Evanston, N.D.Ill.1971, 335 F. Supp. 396; Blackshear Residents Organization v. Housing Authority of the City of Austin, *supra*.

### Conclusion

As far as the City officials are concerned, our review of the issues presented and the relief requested convinces us that this is precisely the sort of case referred to in Hawkins v. Town of Shaw which "may be finally disposed of on appeal," and should be. The City's conduct received extended attention in the district court. All of the parties were fully aware of the relevant law and the burden of proof, and all of the factors involved in the City's refusal were presented to the district court. Unlike the situation presented in *Hawkins*, the remedy requested is simple and direct, and requires no difficult or lengthy court supervision. For these reasons, the City officials should be directed to issue the requested letter of confirmation and to allow the farmworkers' housing project to tie into the City's water and sewer system.

As far as the other defendants are concerned, the case will be remanded to the district court for further proceed-

---

13. *See* Gautreaux v. Romney, *supra*, 448 F.2d 731; Shannon v. HUD, *supra*, 436 F.2d 809; Hicks v. Weaver, *supra*, 302 F.Supp. 619; Gautreaux v. Romney, 7th Cir. 1972, 457 F.2d 124; Board of Public Instruction of Taylor Cty., Florida v. Finch, 5th Cir. 1969, 414 F.2d 1068.

ings or findings, consistent with what we have said today.

In disposing of this case as we have, we do not pretend expertise in municipal planning, nor did we need to do so. *See* South Gwinnett Venture v. Pruitt, 5th Cir. 1974, 490 F.2d 5. And we do not in any way intend to minimize the importance of land use planning or Master Plans. On the contrary, we recognize that the protection and controlled use of our environment is of great importance. We would suggest, however, that a city's claim of land use planning is hardly credible where the city denies a minority group's request for municipal services if under the same circumstances it would have granted such a request to an all-white group. To paraphrase Justice Frankfurter, there comes a point where this court should not be ignorant as judges of what we know as men.[14] The City's annexation and land use policies presented only a façade of propriety. Under that façade, the City practiced unjustified racial discrimination. That the Constitution forbids. And since it does, so must we.

Reversed in part; vacated and remanded in part.

CLARK, Circuit Judge (concurring):

I agree with the majority that the district court's finding of "no satisfactory evidence of discrimination" was clearly erroneous. As Judge Thornberry's opinion ably documents, the record demands the conclusion that the City of Delray Beach dealt with persons living outside of its boundaries on a discriminatory basis which was unsupported by any rational relationship to a valid municipal purpose. Such a course of conduct denies equal protection. I conceive it to be unnecessary and unwise to apply the stringent principles of Hawkins v. Town of Shaw to a case such as this. Many constitutionally healthy municipal actions treating with those residing out-side its boundaries may have the *effect* of benefiting one race. The application of the irrebuttable statistical presumption and compelling interest test rationales of *Hawkins* are unwarranted in such a nonresident context.

I concur in the result.

---

14. *See* Watts v. Indiana, 1949, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 96 L.Ed. 1801, 1805.