**CHURCH OF GOD OF LOUISIANA, INC., et al.**

v.

**MONROE–OUACHITA REGIONAL PLANNING COMMISSION et al.**

**Civ. A. No. 75-0342.**

United States District Court,
W. D. Louisiana,
Monroe Division.

Nov. 21, 1975.

©⇒2737

Robert P. McLeod, Monroe, La., for plaintiffs.

Charles H. Heck, Monroe, La., for defendants.

## OPINION

STAGG, District Judge.

### I. INTRODUCTION

This suit is instituted pursuant to 42 U.S.C. § 1981 *et seq.*, and particu-

larly Sections 1982 and 1983 to redress the deprivation of civil rights protected by said statutes. The action is also based upon the First, Fifth and Fourteenth Amendments to the United States Constitution. The jurisdiction of this Court is founded upon 28 U.S.C. § 1343. The plaintiffs are Church of God of Louisiana, Inc., and several individual black citizens and the class they purport to represent. There are numerous defendants in this lawsuit and they appear as follows: The City of Monroe, a municipal corporation and an entity of the State of Louisiana; The Monroe-Ouachita Regional Planning Commission, a legal entity created by the laws of the State of Louisiana and the City of Monroe; Dr. Ronald L. Marionneux, the Planning Director of the Monroe-Ouachita Regional Planning Commission, in his individual and official capacities; the several members of the Monroe-Ouachita Regional Planning Commission in their individual and official capacities; and Robert S. Norris, the Zoning Administrator for the Office of Zoning Administration of the City of Monroe in his individual and official capacities. Pursuant to certain pre-trial motions, this Court dismissed defendants City of Monroe, the Planning Commission, the Planning Director and the Zoning Administrator of the City of Monroe.[1]

This suit arises out of the Monroe-Ouachita Regional Planning Commission's refusal to approve plaintiffs' request for permission to operate a day care center at a designated location in the City of Monroe. Plaintiffs allege that the refusal of said request was racially discriminatory in purpose and effect.

### II. BACKGROUND

For the purpose of clarity, it is necessary to examine the zoning scheme of

---

1. The City of Monroe and the Monroe-Ouachita Regional Planning Commission are not proper party defendants since the sole jurisdictional basis is 28 U.S.C. § 1343 and 42 U.S.C. § 1983. See *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); and *United Farmworkers v. City of Delray Beach*, 493 F.2d 799 (5th Cir. 1974). Defendants Marionneaux and Norris were dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

the City of Monroe. The zoning classifications of that City are created by Sections 27–30 of the Monroe City Code which provide in pertinent part:

"(1) Creation of districts. For the purpose of this ordinance (chapter) the City of Monroe is divided into the following districts:

Resident districts:
R–1 districts: One-family residence districts.
R–1M districts: Two-family low density multiple-family residence districts.
R–2 districts: Multiple-family residence districts.

Business districts:

B–1 districts: Transition business districts.
B–2 districts: Neighborhood business districts.
B–3 districts: General business districts.
B–4 districts: Central business districts.
B–5 districts: Business park districts.

Industrial districts:

I–1 districts: Light industry districts.
I–2 districts: Heavy industrial districts.
O–L districts: Open land districts.

"For the purpose of this ordinance (chapter), these districts shall be ranked with respect to degree of restriction, in descending order of restriction, as follows: O–L, R–1, R–1M, R–2, B–1, B–2, B–4, B–5, B–3, I–1, I–2."

In subsequent portions of the ordinance, each of the above classifications are set forth, and within each, certain permitted uses are enumerated. These permitted uses are designated as uses by right, uses requiring planning approval and special exception uses. A use indicated as a use by right is permitted without the necessity of any special consent from the Planning Commission. Uses requiring Planning approval require approval of location and site plan by the Planning Commission as a prerequisite for operation within the particular zoning classification. Finally, special exception uses require, in addition to the above-mentioned Commission approval, approval by the Monroe Board of Adjustment. The use application is submitted to the Board of Adjustment only after approval is granted by the Planning Commission.

An examination of the Ordinance reveals that while a particular use might be permitted of right in a less restricted zoning classification, that identical use may require Planning or special exception approval in more restrictive classifications. For example, while a day care center is a use by right in a transition business district[2] and a permitted use in a general business district[3], it is a special exception use in three residential classifications enumerated in the Ordinance.[4]

In 1970, the predecessor in name of plaintiff congregation was created as the Progressive Church of God in Christ, with the Reverend J. B. Bradley as pastor. The congregation of this newly-established church, which was exclusively black, founded its first home at 315 Wilson Street in Monroe, Louisiana. Until recently, Wilson Street served to separate the traditionally white area lying on the west side of the street from the traditionally black area lying on the street's east side. The above specified Wilson Street location lies on the east side of that street.

2. City of Monroe Code Section 27–32(1)(A)(1)

3. City of Monroe Code Section 27–32(3)(A)(1)

4. City of Monroe Code Sections 27–32(1)(A)(3), (2)(A)(3) and (3)(A)(3).

The Wilson Street facility had previously applied for and was granted approval for special exception use as a day care center. This initial application was submitted by the white owner of the premises. Reverend Bradley, as tenant, later sought Planning Commission approval for use of the facility as a church and a day care center. This approval was granted.

During 1972 the Progressive Church sought a new home and discovered a vacant church with adjoining structures located at 2500 Georgia Street. This location is west of Wilson Street and lies among primarily white residences. This property was titled in the name of Church of God of Louisiana, Inc., and arrangements were made for the black congregation to occupy the premises on a lease-purchase basis. Immediately after the black congregation assumed occupancy of the premises, various white neighbors residing in the vicinity initiated complaints to the police department and the Zoning Administrator concerning noise levels and parking.

In 1974 the Progressive Church of God in Christ merged with the Church of God of Louisiana, Inc., and the congregation purchased the Georgia Street property. At this time, the Wilson Street day care facility remained in operation, although the church itself was functioning at the Georgia Street location. However, it soon became apparent that it was not economically feasible for the church to continue to operate both facilities and the decision was made to remodel the Georgia Street facility, thus enabling the day care services to operate at that location.

Remodelling was begun at the Georgia Street facility and Reverend Bradley filed his application for special exception use with the Planning Commission.[5] A hearing on the application before the Planning Commission was scheduled for October 7, 1974. Prior to the hearing

date, the special exception application was routinely submitted to Dr. Ron Marionneaux, the Planning Director for the City of Monroe and advisor to the Planning Commission. Ray Mears, a member of Dr. Marionneaux's staff, visited the Georgia Street site, compiled certain information and recommended to Dr. Marionneaux that the application be approved. Dr. Marionneaux reviewed and joined in that recommendation, submitting it to the Planning Commission prior to the meeting of October 7, 1975.

On October 7, 1974, the matter came up for hearing before the Planning Commission. Reverend Bradley appeared at the hearing to support plaintiffs' application and several white Georgia Street residents appeared in opposition thereto. At that time, the Planning Commission announced that plaintiffs' application, along with day care applications by two white applicants, were to be continued until October 21, 1974 to allow the Commission sufficient opportunity to conduct a day care survey. This was the first day care study ordered by the Commission in its 13-year history.

During the interim between the October 7 and October 21 meetings, the day care survey was prepared, as well as an extensive census population study of the Georgia Street area. The census study was the first ever ordered by the Commission in connection with a planning approval application, and this study was not ordered in connection with the day care applications by two white applicants.

On October 21, 1974, the Commission met and heard comments as to the special exception application for 2500 Georgia Street. At this hearing, Dr. Marionneaux testified that he had orally advised the Planning Commission that he had changed his opinion during the period between October 7 and October 21 and he now recommended denial of the

---

5.　Special exception use approval was required, inasmuch as the Georgia Street location was within one of the three residential classifications set forth in the Monroe City Ordinance.

application. The Commission then ruled:

"That the application be denied because the size of this proposed development makes it more in the nature of a rather large commercial enterprise, and as such is incompatible with and not in harmony with the orderly and appropriate growth of the neighborhood district, and inasmuch as the applicant is now operating a large center nearby." [6]

The two white applicants previously referred to received approval of their applications, albeit Dr. Marionneaux's recommendation that both applications be denied.

In December, 1974, plaintiff church filed another application with the Commission. Again, Ray Mears did the necessary review work and submitted to Dr. Marionneaux his recommendation that the application be approved. A hearing on this application was set for January 13, 1975 and again substantial opposition from several white neighbors was dominant throughout the hearing. The application was again denied and this litigation resulted therefrom.

## III. INITIAL DETERMINATION OF DISCRIMINATION

■■ It cannot now be doubted that one of the most well recognized principles underlying our Constitution is that distinctions in treatment based on race are inherently suspect. See *Brown v. Board of Education,* 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954); *McLaughlin v. Florida,* 379 U.S. 184, 85 S. Ct. 283, 13 L.Ed.2d 222 (1964); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). To establish a *prima facie* case of racial discrimina-

tion, the plaintiffs need only prove that the conduct of the defendant had a discriminatory effect. See *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach,* 493 F.2d 799 (5th Cir. 1974); *Hawkins v. Town of Shaw, Mississippi,* 461 F.2d 1171 (5th Cir. 1972); *Dailey v. City of Lawton, Oklahoma,* 425 F.2d 1037 (10th Cir. 1970). The plaintiff need not show that the action resulting in racial discrimination was racially motivated. See *Williams v. Matthews Co.,* 499 F.2d 819 (8th Cir. 1974); *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, supra.*

■ In reviewing the record in this context, this Court has discovered several instances of "distinctive treatment" apparently based on race. One of the first indications of such treatment was the Commission's day care center survey. As previously indicated, such a survey was deemed necessary only after the church's application was filed with the Commission. Additionally, it is interesting to note that this was the first survey of this kind in the Commission's history.

A second act of "distinctive treatment" involved the detailed examination of plaintiff's property and the census population study. Following the October 7 hearing, Mr. Mears was instructed to measure the church area as well as the adjacent streets, though he had never been so instructed in his investigations of previous day care center applications. Further, Dr. Marionneaux compiled statistical information concerning the ages of the residents for the stated purpose of determining the need for a day care center in the Georgia Street neighborhood. Dr. Marionneaux ac-

6. The requirements for Planning approval are set out in City of Monroe Code, Section 27–31(1)(A)(2) as follows:

"(2) *Uses requiring Planning approval.* The uses listed below are permitted upon approval of the location and site plan thereof by the Planning Commission as

being appropriate with regard to transportation and access, water supply, waste disposal, fire and police protection, and other public facilities, as not causing undue traffic hazard, and as being in harmony with the orderly and appropriate development of the district in which the use is located."

knowledged that he had never performed a census study in connection with previous applications and he did not do so as regards the two day care center applications submitted by white applicants during the same time period.[7]

Perhaps the most blatant evidence of "distinctive treatment" surfaces upon examination of the treatment given previous day care center applications by the Commission. The Commission's stated reasons for denying plaintiff's application were that the proposed site was not appropriate with regard to transportation and access, might cause undue traffic hazards and was not in harmony with the orderly and appropriate development of the district. Several witnesses produced by the defense testified that approval of plaintiff's application would aggravate traffic problems due to the lack of parking area and the narrowness of neighborhood streets. However, the record is replete with evidence of instances where the Commission has approved day care center applications for locations fraught with transportation and traffic problems more onerous than those confronted by the Georgia Street site. It is notable that this evidence has gone virtually unrebutted.

In this light and based upon the overwhelming evidence introduced, this Court finds, notwithstanding the attempts by the defendants to defend their actions, that the plaintiffs have clearly and convincingly met their burden of establishing a case of racial discrimination.

## IV. JUSTIFICATION FOR DISCRIMINATION

■■ Once the existence of a racially discriminatory effect is proven, the burden shifts to the defendant to demonstrate that the discrimination was neces-

sary to promote a compelling governmental interest. *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, supra; Loving v. Virginia, supra.*

Defendants suggest the following reasons as sufficiently compelling to justify the discrimination resulting from their actions:

1. Traffic and transportation problems;

2. The absence of a need for a day care facility; and

3. Compliance with the Master Plan.

Defendants argue that approval of the application in question would have resulted in traffic hazards and dangerous road conditions due to the narrow nature of the neighborhood streets. However, when it is recalled that defendants have ignored these conditions in approving numerous previous applications, this contention loses much, if not all, of its force. See *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, supra.*

Defendants also argue that denial of plaintiffs' application was proper inasmuch as the census and day care surveys indicated that there existed no need for a day care center in the Georgia Street area. Again, such a contention hardly appears credible in light of the dubious accuracy of said surveys as well as the fact that surveys of this nature were never ordered for previous day care center applications.

Finally, defendants suggest that denial of the application was necessary to maintain compliance with the city's "master plan". Counsel for plaintiffs in his post-trial brief answers this contention by stating that:

"  *   *   *  there was no explanation in any meaningful sense whatsoever to

7. In any event, the accuracy of the census study is indeed questionable. In conducting the study, only 1970 census figures were included. Additionally, Dr. Marionneaux, in his census study, neglected to consider a number of children residing within a few blocks of the Georgia Street location.

Therefore, Dr. Marionneaux's conclusion that the area did not have a sufficient number of pre-school age children to justify another day care center would appear to be based, at least in part, on incomplete and tainted information.

illustrate how placing of the day care center at 2500 Georgia Street would offend the integrity of the master plan."

This Court is in agreement.

After a complete review of the record, this Court cannot find that defendants have even come close to meeting their burden. The justifications offered by defendants are wholly devoid of the requisite "compelling nature". This Court cannot be swayed by what defendants articulate. To stamp with Court approval defendants' conduct in the case *sub judice* would be a step backward in the Court's march toward insuring racial equality, a step this Court is unwilling to take.

### RELIEF

 Plaintiffs have prayed for declaratory, injunctive and monetary relief as well as an award of reasonable attorney's fees. This Court finds that defendants' denial of the application was violative of the constitutional and statutory rights of the plaintiffs herein. This Court further finds that the plaintiffs are entitled to a permanent injunction enjoining defendants from any further acts of a discriminatory nature and enjoining defendants to grant and issue the approval necessary to allow plaintiffs to operate the proposed day care center at 2500 Georgia Street.[8] The requested monetary relief is denied inasmuch as plaintiffs have not proven their entitlement thereto.

A recent United States Supreme Court decision has clarified the state of the law regarding a party's entitlement to attorney's fees. In *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Court ruled out the right of a court to award attorney's fees when not authorized by specific statute. However, the following exceptions to that rule were recognized by the Court: 1.) A contract between the parties; 2.) The common fund theory; or 3.) Cases involving willful disobedience of a court order or instances of bad faith, vexations, wanton or oppressive conduct. *Supra*, 95 S.Ct. at 1621–23.

Inasmuch as counsel for both parties were without benefit of the guidance furnished by the *Alyeska Pipeline* decision in presenting their arguments, they are hereby ordered to submit to this Court, within ten (10) days, a brief supplemental memorandum on the limited issue of plaintiffs' entitlement to attorney's fees.

The foregoing shall constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

---

8. This Court finds it unnecessary to determine whether class action treatment should be accorded this action since the decree to which plaintiffs are entitled is the same whether or not the purported class is eventually certified. The nature of the relief awarded plaintiffs herein requires that the decree run to the benefit of not only the named plaintiffs but also to all persons similarly situated. See *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, supra*.